# Exhibit A
# Part 1

AGREEMENT AND PLAN OF MERGER

by and among

GSI COMMERCE, INC.,

COLA ACQUISITION CORPORATION,

RETAIL CONVERGENCE, INC.,

THE PRINCIPAL STOCKHOLDERS OF RETAIL CONVERGENCE, INC.

and

WILLIAM J. FITZGERALD, AS STOCKHOLDERS' REPRESENTATIVE

Dated as of October 27, 2009

GSDOCS\1945236.5

## TABLE OF CONTENTS

ARTICLE I THE MERGER ................................................................................................2

Section 1.1    The Merger...............................................................................................2
Section 1.2    Closing .....................................................................................................2
Section 1.3    Effective Time ..........................................................................................2
Section 1.4    Effects of the Merger ...............................................................................2
Section 1.5    Certificate of Incorporation; Bylaws .......................................................2
Section 1.6    Directors and Officers..............................................................................2
Section 1.7    Additional Actions ...................................................................................3

ARTICLE II EFFECT OF THE MERGER ON THE CAPITAL STOCK OF THE
            CONSTITUENT CORPORATION; DELIVERY OF CONSIDERATION ............3

Section 2.1    Certain Definitions...................................................................................3
Section 2.2    Effect on Capital Stock ............................................................................9
Section 2.3    Dissenting Holders.................................................................................10
Section 2.4    Effect of the Merger on Company Options and Unvested Company Restricted
              Shares...................................................................................................11
Section 2.5    Escrow....................................................................................................13
Section 2.6    Disbursement. ........................................................................................14
Section 2.7    Withholding Rights.................................................................................17
Section 2.8    Unclaimed Amounts ..............................................................................17
Section 2.9    Earn-Out Payments. ...............................................................................18

ARTICLE III REPRESENTATIONS AND WARRANTIES OF COMPANY.............................29

Section 3.1    Organization and Qualification; Subsidiaries. .......................................29
Section 3.2    Capital Structure. ...................................................................................30
Section 3.3    Authority Relative to this Agreement; Board Recommendation.............32
Section 3.4    Consents and Approvals; No Violations..................................................33
Section 3.5    Financial Statements. .............................................................................33
Section 3.6    Absence of Changes................................................................................34
Section 3.7    Absence of Undisclosed Liabilities ........................................................34
Section 3.8    No Default:..............................................................................................35
Section 3.9    Litigation................................................................................................35
Section 3.10   Compliance with Applicable Law. .........................................................35
Section 3.11   Personnel................................................................................................36
Section 3.12   Employee Benefit Plans; Labor Matters..................................................37
Section 3.13   Environmental Laws and Regulations. ...................................................39
Section 3.14   Taxes. .....................................................................................................41
Section 3.15   Intellectual Property...............................................................................45
Section 3.16   Property and Sufficiency.........................................................................51
Section 3.17   Contracts ................................................................................................51
Section 3.18   Insurance ................................................................................................53

GSDOCS\1945236.5

## TABLE OF CONTENTS (Continued)

Section 3.19    Books and Records ................................................................................................54
Section 3.20    Brokers and Finders; Existing Discussions............................................................54
Section 3.21    Banking Relationships .........................................................................................54
Section 3.22    Vote Required .....................................................................................................55
Section 3.23    Anti-Takeover Statute Not Applicable ..................................................................55
Section 3.24    Certain Relationships and Related Transactions....................................................55
Section 3.25    Questionable Payments........................................................................................55
Section 3.26    Accounts Receivable and Inventory .....................................................................56
Section 3.27    Customers ...........................................................................................................56
Section 3.28    Disclosures...........................................................................................................56

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PARENT AND
                    ACQUISITION SUB ..........................................................................................57

Section 4.1    Organization and Qualification.............................................................................57
Section 4.2    Authority Relative to this Agreement ....................................................................57
Section 4.3    No Violations.......................................................................................................58
Section 4.4    Brokers and Finders.............................................................................................58
Section 4.5    Ownership and Activities of Acquisition Sub .......................................................59
Section 4.6    Parent Capital Stock............................................................................................59
Section 4.7    Earn-Out Payments .............................................................................................59
Section 4.8    Parent SEC Documents........................................................................................59
Section 4.9    Financing.............................................................................................................60
Section 4.10    Well-Known Seasoned Issuer Status/S-3 Eligibility .............................................60
Section 4.11    Compliance with Applicable Law ........................................................................60
Section 4.12    Questionable Payments........................................................................................61
Section 4.13    Solvency..............................................................................................................61

ARTICLE V COVENANTS OF COMPANY .....................................................................................61

Section 5.1    Conduct of Business Prior to Closing....................................................................61
Section 5.2    Exclusivity; No Solicitation..................................................................................65
Section 5.3    Breach of Representations and Warranties; Notification; Access to
                    Information. ........................................................................................................65
Section 5.4    Stockholder Consent; Notice to Holders of Company Stock...................................66

ARTICLE VI COVENANTS OF PARENT........................................................................................67

Section 6.1    Breach of Representations and Warranties; Notification; Access to
                    Information. ........................................................................................................67

ARTICLE VII ADDITIONAL AGREEMENTS .................................................................................68

Section 7.1    Confidentiality .....................................................................................................68
Section 7.2    Legal Conditions to the Merger............................................................................68
Section 7.3    HSR Act Filings...................................................................................................69
Section 7.4    Expenses .............................................................................................................70
Section 7.5    Public Announcements ........................................................................................70

ii

TABLE OF CONTENTS (Continued)

Section 7.6    [Intentionally omitted]. ........................................................................70
Section 7.7    Employee Matters. ...............................................................................70
Section 7.8    Tax Matters. ........................................................................................71
Section 7.9    Termination of Certain Agreements ......................................................74
Section 7.10   Pre-Closing Deliveries. .......................................................................74
Section 7.11   [Intentionally omitted]. ........................................................................74
Section 7.12   Incentive Bonus Plan ...........................................................................74
Section 7.13   Director and Officer Indemnification. ..................................................74
Section 7.14   Code Section 280G Matters .................................................................75
Section 7.15   Attorney Client Privilege .....................................................................75
Section 7.16   Company Credit Facility. ......................................................................75
Section 7.17   Company Guaranty Shareholder Agreement ..........................................76

ARTICLE VIII CONDITIONS PRECEDENT .................................................................76

Section 8.1    Conditions to Each Party's Obligation to Effect the Merger. .................76
Section 8.2    Conditions of Obligations of Parent and Acquisition Sub. ....................76
Section 8.3    Conditions of Obligation of Company and the Principal Stockholders.................79

ARTICLE IX INDEMNIFICATION ................................................................................80

Section 9.1    Indemnification Relating to Agreement. ................................................80
Section 9.2    Third Party Claims. ..............................................................................83
Section 9.3    Binding Effect .....................................................................................84
Section 9.4    Limitations. .........................................................................................84
Section 9.5    Time Limit. ..........................................................................................85
Section 9.6    Contribution ........................................................................................86
Section 9.7    Exclusive Remedy. ...............................................................................86
Section 9.8    Payment of Parent Indemnifiable Claims. .............................................86
Section 9.9    Investigation........................................................................................87
Section 9.10   No Company Recourse .........................................................................87

ARTICLE X TERMINATION, AMENDMENT AND WAIVER ........................................87

Section 10.1   Termination..........................................................................................87
Section 10.2   Effect of Termination...........................................................................88
Section 10.3   Company Fees......................................................................................89
Section 10.4   Parent Fees. ........................................................................................89

ARTICLE XI ADDITIONAL POST CLOSING MATTERS .............................................90

Section 11.1   PCI Certification ..................................................................................90

ARTICLE XII GENERAL PROVISIONS .......................................................................90

Section 12.1   Notices. ...............................................................................................90
Section 12.2   Interpretation........................................................................................91
Section 12.3   Counterparts ........................................................................................91

iii

TABLE OF CONTENTS (Continued)

Section 12.4    Miscellaneous ................................................................................................................91

Section 12.5    No Joint Venture ............................................................................................................91

Section 12.6    Governing Law ..............................................................................................................92

Section 12.7    Amendment ....................................................................................................................92

Section 12.8    Extension, Waiver ..........................................................................................................92

Section 12.9    Successors and Assigns ..................................................................................................92

Section 12.10  Severability ....................................................................................................................92

Section 12.11  Submission to Jurisdiction ............................................................................................92

Section 12.12  Waiver of Jury Trial ......................................................................................................93

Section 12.13  Stockholders' Representative ........................................................................................93

### Exhibits

| | |
|---|---|
| A | Form of Fischman Employment Agreement |
| B | Form of McNamara Employment Agreement |
| C | Form of Company Guaranty Shareholder Agreement |
| D | Form of Escrow Agreement |
| E | Form of Approval Certificate |
| F | Form of Incentive Plan |
| G | Forms of Non-Compete Agreement |
| H | Investment Letters |
| I | Restated Certificate of Incorporation of Surviving Corporation |
| J | Registration Rights Agreement |
| K | Form of Letter of Transmittal |

GSDOCS\1945236.5

# INDEX OF DEFINED TERMS

2010 Earn-Out Payment............................ 20
2011 Earn-Out Payment............................ 20
2012 Earn-Out Payment............................ 20
2012 Incentive Bonus Plan Amount ......... 20
2012 Stockholder Earn-Out Payment ....... 20
Accelerated Earn-Out Payment.................. 2
Acceleration Percentage............................. 2
Acceptable Amount ................................. 21
Acceptance Notice ................................... 21
Accountant............................................... 21
Acquisition Sub.......................................... 1
Additional Holders................................... 35
Adjusted EBITDA .................................... 19
Adjusted EBITDA Statement ................... 21
affiliate ....................................................... 3
Aggregate Allocable Portion of the Escrow
    Amount ................................................. 3
Aggregate Cap ........................................ 19
Aggregate Eligible Option Exercise Price.. 4
Agreement.................................................... 1
Alternative Payment.................................... 3
Annual Operating Plan............................. 24
Annual Synergy Savings........................... 25
Antitrust Laws.......................................... 10
Approval Certificate.................................... 7
Authorized Representatives ........................ 9
Average Closing Price ......................... 4, 17
Balance Sheet........................................... 10
business day ............................................... 4
Cap-X Limit............................................. 26
Certificate of Merger.................................. 2
Change in Control Payments ...................... 4
Closing........................................................ 2
Closing Date................................................ 2
Code.......................................................... 18
Company...................................................... 1
Company Certificate of Incorporation........ 4
Company Common Stock............................ 4
Company Credit Facility........................... 16
Company Disclosure Schedule .................... 4
Company Executives ................................ 19
Company Guaranty Share Conversion Ratio
    ............................................................... 5

Company Guaranty Shareholder................. 4
Company Guaranty Shareholder Agreement
    ............................................................... 5
Company Guaranty Shares ......................... 5
Company Intellectual Property ................. 22
Company Material Adverse Effect ............. 6
Company Options ....................................... 5
Company Outstanding Common Share
    Equivalents........................................... 5
Company Permits...................................... 12
Company Preferred Stock ........................... 5
Company Product...................................... 22
Company Registered Intellectual Property
    Rights ................................................. 23
Company Restricted Shares ........................ 5
Company Securities .................................... 7
Company Securityholders ........................... 6
Company Stock........................................... 6
Company Stock Plans ................................. 6
Company Stockholders ............................... 6
Company Web Sites.................................. 26
Company's Audited Financial Statements 10
Confidential Information ............................ 8
Contingent Transaction Expenses............... 6
Contract.................................................... 30
Controls.................................................... 10
Copyrights................................................ 23
Damages................................................... 12
default ...................................................... 30
DGCL.......................................................... 2
Disclosing Person....................................... 9
Dissenting Shares..................................... 11
Earn-Out Allocation Schedule................. 22
Earn-Out Eligible Holder......................... 19
Earn-Out Payments .................................. 19
Earn-Out Period ...................................... 19
Effective Time ............................................ 2
Elective Termination................................... 4
Eligible Employees .................................. 19
Eligible Vested Company Option ............. 12
Employee Plans........................................ 13
Employment Agreements............................ 1
Environmental Claim ............................... 17

GSDOCS\1945236.5

## INDEX OF DEFINED TERMS (Continued)

Environmental Laws .................................. 17
ERISA ...................................................... 13
ERISA Affiliate ........................................ 13
Escrow Agent ........................................... 14
Escrow Agreement .................................... 14
Escrow Amount ......................................... 6
Escrow Funds ............................................ 14
Escrow Holders .......................................... 6
Exchange Act .............................................. 3
Excluded Related Party ............................. 29
Final Determination .................................. 14
Financial Statements ................................. 10
Fiscal Year ............................................... 19
Fiscal Year 2010 ....................................... 19
Fiscal Year 2011 ....................................... 19
Fiscal Year 2012 ....................................... 19
Fischman Employment Agreement ............. 1
GAAP ....................................................... 10
Government Consent ................................... 9
Governmental Entity ................................... 9
HSR Act ................................................... 10
Incentive Bonus Plan ................................ 15
Incentive Bonus Plan Amount .................. 20
Indebtedness ............................................. 11
Indemnified Persons .................................. 38
Indemnifying Holders ................................. 6
Indemnitee ................................................ 24
Indemnitor ................................................ 24
Intellectual Property Rights ...................... 22
Investment Letter ........................................ 1
IRS ........................................................... 14
Knowledge .................................................. 6
Leased Property ......................................... 28
Leases ....................................................... 28
Legal Requirement ...................................... 6
Lien ............................................................ 8
Limited License ........................................ 26
Limited License Software .......................... 26
Limited Licenses ....................................... 26
Majority Interest ....................................... 37
Market Disruption Event ............................. 6
Material Software ...................................... 24
Materials of Environmental Concern ........ 18
McNamara Employment Agreement ........... 1
Merger ........................................................ 2
Merger Consideration .................................. 7

New Preferred Stock .................................. 11
Non-Principal Escrow Holders .................... 7
Objection Notice ....................................... 21
Outside Date .............................................. 29
Owned Property ......................................... 27
Parent ......................................................... 1
Parent Corporation Change of Control ....... 3
Parent Disclosure Schedule ....................... 34
Parent Existing Debt Documents .............. 35
Parent Failure to Close .............................. 30
Parent Group ............................................. 24
Parent Indemnifiable Amounts .................. 22
Parent Indemnified Parties ........................ 21
Parent Material Adverse Effect ................. 34
Parent Proceeds ........................................... 3
Parent SEC Documents ............................. 37
Parent Stock ................................................ 7
Parent Threshold Amount .......................... 25
Patents ...................................................... 22
Paying Agent ............................................. 15
PBGC ....................................................... 14
PCBs ......................................................... 17
PCI Standards ........................................... 31
Per Share Common Consideration .............. 7
Per Share Common Merger Cash
    Consideration ........................................ 7
Per Share Common Merger Stock
    Consideration ........................................ 7
Per Share Preferred Consideration ............. 7
Per Share Preferred Merger Cash
    Consideration ........................................ 7
Per Share Preferred Merger Stock
    Consideration ........................................ 8
Percentage ................................................... 8
Person .......................................................... 8
Principal Stockholder .................................. 1
Principal Stockholders ................................. 1
Prior Payments ............................................ 3
Registered Intellectual Property Rights .... 23
Registration Rights Agreement ................. 35
Related Party ............................................. 29
Related Party Agreements ......................... 29
Reportable Transaction ............................. 20
Representatives ............................................ 5
Requisite Stockholder Approval ................ 32
Restricted Transaction ................................. 6

GSDOCS\1945236.5

## INDEX OF DEFINED TERMS (Continued)

Sales Taxes .................................. 11
SB Merger Closing Date ................. 29
Securities Act ............................... 32
Security Breach ............................. 25
Securityholder Merger Payment ..... 16
Series A Convertible Preferred Stock ... 6
Significant Customer ..................... 33
Smaller Company Securityholder ...... 8
Software ...................................... 23
Stock Election Amount ................... 23
Stockholder Earn-Out Payment ....... 20
Stockholder Indemnifiable Amounts ... 23
Stockholder Loan Repayment .......... 18
Stockholder Merger Payment .......... 16
Stockholder Threshold Amount ....... 26
Stockholders' Representative .......... 35
Stockholders' Written Consents ....... 7
Straddle Period ............................ 12
subsidiaries ................................... 8
subsidiary ...................................... 8
Successor ....................................... 4
Surviving Corporation .................... 2
Surviving Corporation Change of Control .. 3
Surviving Corporation Issued Share Capital 8
Synergy Expense ........................... 25
Tail Policy ................................... 15

Tax ............................................. 18
Tax Claim .................................... 13
Tax Return ................................... 18
Taxes .......................................... 18
Taxing Authority ........................... 18
Third Party Claim ......................... 24
Threats ....................................... 25
Total Company Stockholder Consideration 9
Total Merger Cash Consideration ..... 9
Total Merger Stock Consideration ..... 9
Trade Secrets ............................... 22
Trademarks .................................. 23
Trading Day ................................... 9
Transaction Expenses ...................... 9
Transfer Taxes ............................. 12
Treasury Regulations ..................... 18
Unreserved Sales Taxes .................. 14
Unvested Company Option ............. 12
Unvested Company Restricted Share .. 12
URLs .......................................... 23
Vested Company Option ................. 12
Vested Option Payment .................. 13
Violate .......................................... 9
WARN ......................................... 13
Web ........................................... 25

GSDOCS\1945236.5

## AGREEMENT AND PLAN OF MERGER

This AGREEMENT AND PLAN OF MERGER (this "Agreement"), dated as of October 27, 2009, by and among GSI Commerce, Inc., a Delaware corporation ("Parent"), Cola Acquisition Corporation, a Delaware corporation and a wholly owned subsidiary of Parent ("Acquisition Sub"), Retail Convergence, Inc., a Delaware corporation ("Company"), the stockholders of Company who execute a Joinder to this Agreement in the form approved by Parent ("Joinder") (individually, a "Principal Stockholder,", collectively, the "Principal Stockholders") and the Stockholders' Representative.

### W I T N E S S E T H:

WHEREAS, the boards of directors of Parent, Acquisition Sub and Company have approved, and deem it advisable and in the best interests of their respective stockholders, to consummate the acquisition of Company by Parent and Acquisition Sub upon the terms and subject to the conditions set forth herein;

WHEREAS, Parent, Acquisition Sub, Company and the Principal Stockholders desire to make certain representations, warranties and agreements in connection with the Merger and also to prescribe various conditions to the Merger;

WHEREAS, in order to induce Parent and Acquisition Sub to enter into this Agreement and to consummate the transactions contemplated hereby: prior to or concurrently with the execution and delivery of this Agreement: (a) Benjamin D. Fischman, the Chairman of the Board, President, Chief Executive Officer and a principal stockholder of the Company, has entered into an employment agreement attached hereto as Exhibit A (the "Fischman Employment Agreement") and (b) Edward M. McNamara, the Executive Vice President, Chief Financial Officer, and Chief Operating Officer and a principal stockholder of the Company, has entered into an employment agreement attached hereto as Exhibit B (the "McNamara Employment Agreement" and together with the Fischman Employment Agreement, the "Employment Agreements"); and

WHEREAS, prior to or concurrently with the execution and delivery of this Agreement, Parent and the Company Guaranty Shareholder has executed and delivered the Company Guaranty Shareholder Agreement; and

WHEREAS, prior to or concurrently with the execution and delivery of this Agreement, certain of the Company Securityholders have executed and delivered Investment Representation Letters attached hereto as Exhibit H (each an "Investment Letter") to the Parent.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, the parties hereby agree as follows:

## ARTICLE I

## THE MERGER

Section 1.1    The Merger.    Upon the terms and subject to the provisions of this Agreement and the applicable provisions of Delaware law, Acquisition Sub will be merged with and into Company, the separate corporate existence of Acquisition Sub shall cease, and Company shall continue as the surviving corporation (the "Merger"). Company as the surviving corporation after the Merger is hereinafter sometimes referred to as the "Surviving Corporation."

Section 1.2    Closing.    The closing (the "Closing") of the Merger will take place at 10:00 a.m. on a date to be specified by the parties, which shall be no later than the three (3) business days after satisfaction or waiver of the conditions set forth in Article VIII (the "Closing Date"), at the offices of Blank Rome LLP, One Logan Square, Philadelphia, PA 19103, unless another time, date or place is agreed to in writing by the parties hereto.

Section 1.3    Effective Time.    Subject to the provisions of this Agreement, as soon as practicable on the Closing Date, Company, Parent and Acquisition Sub will cause a certificate of merger ("Certificate of Merger") to be executed and, as soon as practicable thereafter, filed with the Secretary of State of the State of Delaware, as provided in the Delaware General Corporation Law (the "DGCL"). The Merger shall become effective at such time as such filing is made with the Secretary of State of the State of Delaware or at such later time as is provided in the Certificate of Merger (the date and time of such effectiveness, being the "Effective Time").

Section 1.4    Effects of the Merger.    At the Effective Time, the effect of the Merger shall be as provided in this Agreement, the Certificate of Merger and the applicable provisions of Delaware law, including Section 259 of the DGCL.

Section 1.5    Certificate of Incorporation; Bylaws.

(a)    Certificate of Incorporation.    At the Effective Time, the certificate of incorporation of the Surviving Corporation shall be amended and restated to be in the form attached as Exhibit I hereto, until thereafter amended as provided therein or in accordance with applicable law.

(b)    Bylaws.    At the Effective Time, the bylaws of Company shall be amended and restated in their entirety to be identical to the bylaws of Acquisition Sub as in effect immediately prior to the Effective Time (except that the name of Surviving Corporation as stated on the face of the bylaws shall be changed to the name of Company), until thereafter amended in accordance with applicable law, the certificate of incorporation of the Surviving Corporation and the bylaws of the Surviving Corporation.

Section 1.6    Directors and Officers.    From and after the Effective Time, the directors of Acquisition Sub immediately prior to the Effective Time shall be the initial directors of the Surviving Corporation, and the officers of Company at the Effective Time shall be the initial officers of the Surviving Corporation, in each case until their respective successors are duly elected or appointed and qualified in accordance with applicable law, the certificate of

2

GSDOCS\1945236.5

incorporation of the Surviving Corporation and the bylaws of the Surviving Corporation, or their earlier death, resignation or removal.

Section 1.7    Additional Actions.  If, at any time after the Effective Time, the Surviving Corporation shall consider or be advised that any deeds, bills of sale, assignments, assurances or any other actions or things are necessary or desirable to vest, perfect or confirm of record or otherwise in the Surviving Corporation its right, title or interest in, to or under any of the rights, properties or assets of Acquisition Sub or Company or otherwise to carry out this Agreement, the officers and directors of the Surviving Corporation shall be authorized to execute and deliver, in the name and on behalf of Acquisition Sub or Company, all such deeds, bills of sale, assignments and assurances and to take and do, in the name and on behalf of Acquisition Sub or Company, all such other actions and things as may be necessary or desirable to vest, perfect or confirm any and all right, title and interest in, to and under such rights, properties or assets in the Surviving Corporation or otherwise to carry out this Agreement.

## ARTICLE II

## EFFECT OF THE MERGER ON THE CAPITAL STOCK OF THE CONSTITUENT CORPORATION; DELIVERY OF CONSIDERATION

Section 2.1    Certain Definitions.  For purposes of this Agreement, the following terms shall have the following meanings:

"affiliate" has the meaning set forth in Rule 12b-2 promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act").

"Aggregate Allocable Portion of the Escrow Amount" means, with respect to any Escrow Holder, that pro rata portion of the Escrow Funds determined by multiplying the Escrow Funds by such Escrow Holder's Percentage.

"Aggregate Eligible Option Exercise Price" means the sum of the exercise prices of all Eligible Vested Company Options as of immediately prior to the Effective Time.

"Average Closing Price" means the average (rounded to two decimal places) of the closing prices of Parent Stock as reported on the Nasdaq Global Select Market for the ten (10) trading days ending on and including the third (3rd) Trading Day prior to the Closing Date; provided, however, that the "Average Closing Price" shall not exceed a maximum of $24.03 and shall not be less than a minimum of $16.02.

"business day" means any day other than a Saturday, Sunday, or a day on which banking institutions in New York, New York are permitted or obligated by law to be closed for regular banking business.

"Change in Control Payments" means (a) any severance, retention, bonus, gross-up or other similar payment by Company or any of its subsidiaries to any Person under any Contract (as defined in Section 3.17) or Employee Plan (as defined in Section 3.12) or (b) any increase of any benefits or other amounts otherwise payable by Company, in each case of clauses (a) and (b), to the extent the same will become payable as a result of Company entering into this Agreement

3

or the consummation of any of the transactions contemplated hereby (either alone or in combination with another event), but excluding Transaction Expenses, all of which payments are listed on Section 2.1(a)(i) of the disclosure schedule supplied by Company to Parent (the "Company Disclosure Schedule"); provided, however, that Company shall update such calculation two (2) business days prior to the expected Closing Date to give effect to any changes in such calculations as a result of the passage of time between the date hereof and the Effective Time and the final determination of the amounts and matters that are relevant components of such calculation. For the avoidance of doubt, "Change in Control Payments" shall not include payments (or withholding or other Taxes payable in respect thereof) (i) relating to the vesting of, or the acceleration of the vesting of, any Company Options or Company Restricted Shares, (ii) relating to any Merger Consideration (including without limitation the allocation thereof), (iii) relating to any Earn-Out Payments (including without limitation the allocation thereof), (iv) relating to any transactions contemplated by the Company Guaranty Shareholder Agreement, or (v) listed on Section 2.1(a)(ii) of the Company Disclosure Schedule.

"Company Certificate of Incorporation" means the Amended and Restated Certificate of Incorporation of Company, as amended, as currently in effect, and as it may be further amended from time to time after the date hereof and prior to the Effective Time not in contravention of the provisions of this Agreement.

"Company Common Stock" means the common stock, par value $.001 per share, of Company.

"Company Guaranty Shareholder" means NMF Holdings LLC, a Delaware limited liability company.

"Company Guaranty Shareholder Agreement" means the Put and Call Agreement among Parent, Company Guaranty Shareholder and the Stockholders' Representative, in substantially the form attached as Exhibit C hereto.

"Company Guaranty Share Conversion Ratio" means a fraction, (i) the numerator of which is equal to the product of (A) 10 multiplied by (B) the Surviving Corporation Issued Share Capital, and (ii) the denominator of which is equal to the sum of (A) the number of shares of Company Common Stock issued and outstanding as of immediately prior to the Effective Time (which for clarification shall include, without duplication, Company Restricted Shares that will vest as of the Effective Time) plus (B) the number of shares of Company Common Stock into which all shares of Company Preferred Stock issued and outstanding as of immediately prior to the Effective Time would be converted if such shares of Company Preferred Stock were converted into shares of Company Common Stock pursuant to Article FOURTH, C.4 of the Company Certificate of Incorporation (regardless of whether actually converted).

"Company Guaranty Shares" means shares of Company Preferred Stock, if any (not to exceed 500,000 shares) held by Company Guaranty Shareholder as of immediately prior to the Effective Time; provided, however, that if the Effective Time occurs on or after December 31, 2009, then for all purposes of this Agreement, there shall be no Company Guaranty Shares and all provisions of this Agreement related to Company Guaranty Shares shall be disregarded.

4

GSDOCS\1945236.5

"Company Options" means all outstanding options to acquire shares of Company Common Stock, whether under the Company Stock Plans or otherwise (including, other than for purposes of Section 2.4, commitments to issue options).

"Company Outstanding Common Share Equivalents" means the sum of (i) the number of shares of Company Common Stock issued and outstanding as of immediately prior to the Effective Time (which for clarification shall include, without duplication, Company Restricted Shares that will vest as of the Effective Time) plus (ii) the number of shares of Company Common Stock subject to Eligible Vested Company Options as of immediately prior to the Effective Time plus (iii) the number of shares of Company Common Stock into which all shares of Company Preferred Stock issued and outstanding as of immediately prior to the Effective Time would be converted if such shares of Company Preferred Stock were converted into shares of Company Common Stock pursuant to Article FOURTH, C.4 of the Company Certificate of Incorporation (regardless of whether actually converted).

"Company Preferred Stock" means the Series A Convertible Preferred Stock, par value $.001 per share, of Company.

"Company Restricted Shares" means all restricted shares of Company Common Stock, whether issued under the Company Stock Plans or otherwise (including, other than for purposes of Section 2.4, commitments to issue restricted shares).

"Company Securityholders" means the holders of Company Securities issued and outstanding as of immediately prior to the Effective Time.

"Company Stock" means the Company Common Stock and the Company Preferred Stock.

"Company Stockholders" means the holders of Company Stock issued and outstanding as of immediately prior to the Effective Time.

"Company Stock Plans" means Company's 2008 Stock Incentive Plan and any other option plan, equity incentive plan, program and arrangement of Company.

"Contingent Transaction Expenses" means (i) Transaction Expenses described in Section 2.9(d) and (ii) Transaction Expenses the amount of which is determined based upon, and the payment of which is subject to the receipt of, any Earn-Out Payments.

"Escrow Amount" means the aggregate of (i) cash of Four Million Four Hundred and Fifty Thousand Dollars ($4,450,000) and (ii) that number of shares of Parent Stock (rounded up to the nearest whole share) equal to Thirteen Million Three Hundred and Fifty Thousand Dollars ($13,350,000) divided by the Average Closing Price.

"Escrow Holders" means Company Stockholders and holders of Eligible Vested Company Options.

"Indemnifying Holders" means Escrow Holders and Principal Stockholders.

5

"Knowledge" of or other derivations of "know" in this Agreement mean: (i) with respect to Company and its subsidiaries, the actual knowledge, after the exercise of reasonable inquiry of personnel and reasonable review of records of Company and its subsidiaries, of any of Benjamin Fischman, Edward McNamara, Shari Shakun, Mark Weinberg, Joel Heberlein, Mark McWeeny, Cheryl Kaplan, Jess Sullivan, Benjamin Katz, Robert Murphy, Marguerite Hill and Heather Hartford; and (ii) with respect to Parent, the actual knowledge, after the exercise of reasonable inquiry of personnel and reasonable review of Parent and its subsidiaries, of any of Michael G. Rubin, Michael R. Conn and Arthur H. Miller.

"Legal Requirement" means any United States federal, state, municipal or local or foreign order, judgment, writ, injunction, decree, law, statute, standard ordinance, code, resolution, promulgation, rule, regulation or any similar provision having the force or effect of law.

"Market Disruption Event" means the occurrence or existence for more than one continuous half hour period in the aggregate on any scheduled Trading Day for Parent Stock of any suspension or limitation imposed on trading (by reason of movements in price exceeding limits permitted by NASDAQ or otherwise) in Parent Stock or in any options, contracts or future contracts relating to such Parent Stock, and such suspension or limitation occurs or exists at any time before 1:00 p.m. (New York City time) on such day.

"Merger Consideration" means: (a) with respect to a share of Company Common Stock, the Per Share Common Consideration; (b) with respect to a share of Company Preferred Stock, the Per Share Preferred Consideration; and (c) with respect to an Eligible Vested Company Option, the Vested Option Payment pursuant to Section 2.4(b).

"Non-Principal Escrow Holders" means the Escrow Holders excluding any Escrow Holder that is a Principal Stockholder.

"Parent Stock" means the common stock, par value $.01 per share, of Parent.

"Per Share Common Consideration" means the (A) Per Share Common Merger Cash Consideration, (B) Per Share Common Merger Stock Consideration and (C) and the right to receive such portion of the Earn-Out Payments, if any, payable pursuant to Section 2.9.

"Per Share Common Merger Cash Consideration" means an amount in cash equal to the quotient obtained by dividing (A) the amount equal to twenty percent (20%) of the Total Merger Cash Consideration by (B) the sum of (i) the number of shares of Company Common Stock issued and outstanding as of immediately prior to the Effective Time (which for clarification shall include, without duplication, Company Restricted Shares that will vest as of the Effective Time) plus (ii) the number of shares of Company Common Stock subject to Eligible Vested Company Options as of immediately prior to the Effective Time.

"Per Share Common Merger Stock Consideration" means that number of shares of Parent Stock (rounded to four decimal places) equal to the quotient obtained by dividing (A) the amount equal to twenty percent (20%) of the Total Merger Stock Consideration by (B) the sum of (i) the number of shares of Company Common Stock issued and outstanding as of immediately prior to the Effective Time (which for clarification shall include, without duplication, Company

6

Restricted Shares that will vest as of the Effective Time) plus (ii) the number of shares of Company Common Stock subject to Eligible Vested Company Options as of immediately prior to the Effective Time; provided, however, the Per Share Common Merger Stock Consideration payable to Smaller Company Securityholders, in lieu of Parent Stock, shall be paid solely in cash equal to (i) the Per Share Common Merger Stock Consideration determined above (prior to such rounding) multiplied by (ii) the Average Closing Price.

"Per Share Preferred Consideration" means the (A) Per Share Preferred Merger Cash Consideration, (B) Per Share Preferred Merger Stock Consideration and (c) and the right to receive such portion of the Earn-Out Payments, if any, payable pursuant to Section 2.9.

"Per Share Preferred Merger Cash Consideration" means an amount in cash equal to the quotient obtained by dividing (A) the amount equal to eighty percent (80%) of the Total Merger Cash Consideration by (B) the number of shares of Company Preferred Stock issued and outstanding as of immediately prior to the Effective Time.

"Per Share Preferred Merger Stock Consideration" means that number of shares of Parent Stock (rounded to four decimal places) equal to the quotient obtained by dividing (A) the amount equal to eighty percent (80%) of the Total Merger Stock Consideration by (B) the number of shares of Company Preferred Stock issued and outstanding as of immediately prior to the Effective Time.

"Percentage" means, with respect to any Escrow Holder, or with respect to any Indemnifying Holder as of a given determination date, as follows:

(a)     as to any Escrow Holder, the percentage equal to (i) the aggregate Merger Consideration (other than any Earn-Out Payments) with respect to the Company Securities held as of immediately prior to the Effective Time by such Escrow Holder divided by (ii) the aggregate Merger Consideration (other than any Earn-Out Payments) with respect to the Company Securities held as of immediately prior to the Effective Time by all Escrow Holders collectively.

(b)     as to each Principal Stockholder, as of a given determination date, the percentage equal to (i) the sum of (A) the aggregate Merger Consideration (other than any Earn-Out Payments) with respect to the Company Securities held as of immediately prior to the Effective Time by such Principal Stockholder plus (B) the aggregate amount of any Earn-Out Payments that, as of such determination date, shall have been actually paid or become due and payable to such Principal Stockholder, divided by (ii) the sum of (A) the aggregate Merger Consideration (other than any Earn-Out Payments) with respect to the Company Securities held as of immediately prior to the Effective Time by all Principal Stockholders collectively plus (B) the aggregate amount of any Earn-Out Payments that, as of such determination date, shall have been actually paid or become due and payable to all Principal Stockholders collectively.

"Person" means an individual, corporation, partnership, association, limited liability company, trust, estate, organization, Governmental Entity or other entity.

7

"Smaller Company Securityholder" means a Company Securityholder that holds of record 200,000 or less Company Outstanding Common Share Equivalents as of immediately prior to the Effective Time.

"subsidiary" or "subsidiaries" means with respect to any Person, any entity or entities of which securities or other ownership interests having voting power sufficient to elect a majority of its board of directors or other governing body are at any time directly or indirectly owned by such Person.

"Surviving Corporation Issued Share Capital" means 1,000, being the aggregate number of shares of capital stock of the Surviving Corporation to be issued and outstanding as of the Effective Time after giving effect to the Merger.

"Trading Day" means any day on which (i) there is no Market Disruption Event and (ii) NASDAQ is open for trading. A "Trading Day" only includes those days that have a scheduled closing time of 4:00 p.m. (New York City time).

"Total Company Stockholder Consideration" means the aggregate consideration payable with respect to shares of Company Stock pursuant to Section 2.2(a) (other than any Earn-Out Payments).

"Total Merger Cash Consideration" means an amount equal to (a) the sum of Ninety Million Dollars ($90,000,000) minus (b) the sum of (i) the amount of the Change in Control Payments plus (ii) the amount of Transaction Expenses (other than Contingent Transaction Expenses).

"Total Merger Stock Consideration" means that number of shares of Parent Stock (rounded to the nearest whole number of shares) equal to Ninety Million Dollars ($90,000,000) divided by the Average Closing Price.

"Transaction Expenses" means (i) the Aggregate Eligible Option Exercise Price and (ii) any and all legal, accounting, consulting, investment banking, financial advisory, brokerage, termination, break-up and other fees and expenses incurred by Company or any of its subsidiaries, Surviving Corporation or any other Person (for which Company or any of its subsidiaries or Surviving Corporation may pay or reimburse others or may otherwise be obligated to pay or reimburse others or may be or may become liable) in connection with this Agreement, the Merger or any of the transactions contemplated hereby, including, without limitation any fees and expenses associated with obtaining necessary or appropriate waivers, consents or approvals of any Governmental Entity or third parties on behalf of Company (but excluding (x) the Change in Control Payments, (y) any fees and expenses incurred by or in respect of Acquisition Sub and (z) any fees and expenses incurred after the Effective Time (other than Contingent Transaction Expenses)), all of which fees and expenses are listed on Section 2.1(b) of the Company Disclosure Schedule opposite the names of the Persons incurring or who have incurred, as applicable, such fees and expenses, respectively; provided, however, that Company shall update such calculation two (2) business days prior to the expected Closing Date to give effect to any changes in such calculations as a result of the passage of time between the date hereof and the Effective Time and the final determination of the amounts and matters that

8

are relevant components of such calculation; provided further, however, that any such information with respect to Contingent Transaction Expenses shall not be deemed final and shall reflect Company's good faith estimate thereof.

Section 2.2    Effect on Capital Stock.  At the Effective Time and upon the terms and subject to the conditions of this Agreement, by virtue of the Merger and without any action on the part of Parent, Acquisition Sub, Company or any Company Securityholder:

(a)    Conversion of Securities.

(i)    Except as otherwise provided in Section 2.2(b) or Section 2.2(c) each share of Company Stock issued and outstanding immediately prior to the Effective Time (other than any Dissenting Shares), shall be converted as follows:

(A)    each share of Company Preferred Stock issued and outstanding immediately prior to the Effective Time (other than the Company Guaranty Shares) shall be converted into the right to receive, subject to Sections 2.5, 2.6 and 2.7, the Per Share Preferred Consideration payable to the holder thereof, without interest, upon the surrender of the certificate representing such share in accordance with the terms hereof and in the manner provided herein; and

(B)    each share of Company Common Stock issued and outstanding immediately prior to the Effective Time shall be converted into the right to receive, subject to Sections 2.5, 2.6 and 2.7, the Per Share Common Consideration payable to the holder thereof, without interest, upon the surrender of the certificate representing such share in accordance with the terms hereof and in the manner provided herein.

(ii)    From and after the Effective Time, each such converted share of Company Stock shall no longer be outstanding and shall be automatically cancelled and retired and shall cease to exist, and each holder of a certificate formerly representing each such share shall cease to have any rights with respect thereto, except the right to receive (subject to the terms of this Agreement) the Merger Consideration payable with respect to such share, if any, without interest, upon the surrender of such certificate in accordance with the terms hereof and in the manner provided herein, or the right, if any, to receive payment from the Surviving Corporation of the "fair value" or "fair market value" of such Dissenting Shares as determined in accordance with the applicable provisions of the DGCL.

(iii)    Section 2.2(a)(iii) of the Company Disclosure Schedule sets forth the following information with respect to each holder of Company Stock:

(A)    the Company Stock held by such holder to be converted at the Effective Time as provided in Section 2.2(a)(i);

(B)    the aggregate Merger Consideration to be paid to such holder, if any, in accordance with the terms hereof and in the manner provided herein in respect of all of the shares of Company Common Stock and shares of Company Preferred Stock owned by such holder as of the date hereof and immediately prior to the Effective Time, subject to withholding for Taxes as described in Section 2.7; provided, however, that Company shall update such calculation two (2) Business Days prior to the expected Closing Date to give effect to any

9

changes in such calculation required as a result of the passage of time between the date hereof and the Effective Time and the final determination of the amounts and matters that are relevant components of such calculation, including the Total Merger Cash Consideration;

(C)    such holder's Aggregate Allocable Portion of the Escrow Amount; provided, however, that Company shall update such calculation two (2) business days prior to the expected Closing Date to give effect to any changes in such calculation required as a result of the passage of time between the date hereof and the Effective Time and the final determination of the amounts and matters that are relevant components of such calculation, including the Total Merger Cash Consideration; and

(D)    the mailing address of such holder.

(b)    Company Guaranty Shares. Each of the Company Guaranty Shares issued and outstanding immediately prior to the Effective Time shall be converted into and become, and shall represent, a number (equal to the Company Guaranty Share Conversion Ratio) of fully paid and nonassessable shares of preferred stock of the Surviving Corporation (the "New Preferred Stock") having the rights, powers and privileges of the New Preferred Stock as set forth in the certificate of incorporation of the Surviving Corporation; provided, however, that, for avoidance of doubt, the aggregate number of shares of the New Preferred Stock issuable upon such conversion shall not exceed 35.5365 shares.

(c)    Cancellation. Each share of Company Stock owned by Parent, Acquisition Sub or any direct or indirect wholly owned subsidiary of Parent immediately prior to the Effective Time shall, by virtue of the Merger and without any action on the part of the holder thereof, cease to be outstanding, be canceled and retired without payment of any consideration therefor and cease to exist. For the avoidance of doubt, and notwithstanding anything in this Agreement to the contrary, each share of Company Stock owned by Company as treasury stock or owned by a direct or indirect subsidiary of Company immediately prior to the Effective Time shall be cancelled, and shall not be converted into the Merger Consideration.

(d)    Capital Stock of Acquisition Sub. All of the shares of common stock of Acquisition Sub issued and outstanding immediately prior to the Effective Time shall be converted into and become, and shall represent, in the aggregate, a number of fully paid and nonassessable shares of common stock of the Surviving Corporation, with the same rights, powers and privileges as the shares so converted, equal to the difference of (i) the Surviving Corporation Issued Share Capital minus (B) the aggregate number of shares of capital stock of the Surviving Corporation into which the Company Guaranty Shares are to be converted at the Effective Time as provided in Section 2.2(b).

Section 2.3    Dissenting Holders.

(a)    Notwithstanding anything in this Agreement to the contrary, any shares of Company Stock outstanding immediately prior to the Effective Time eligible under the DGCL to exercise appraisal or dissenters' rights and held by a holder, if any, who has not voted in favor of the Merger or consented thereto in writing and who has exercised and perfected appraisal or dissenters' rights for such shares in accordance with Section 262 of the DGCL and has not

10

effectively withdrawn or lost such appraisal or dissenters' rights (collectively, the "Dissenting Shares") shall not be converted into or represent the right to consideration for Company Stock set forth in Section 2.2(a), and the holder or holders of such shares shall be entitled only to such rights as may be granted to such holder or holders in Section 262 of the DGCL.

(b)     Notwithstanding the provisions of Section 2.3(a), if any holder of Dissenting Shares shall effectively withdraw or lose (through failure to perfect or otherwise) such holder's appraisal rights and dissenters' rights under Section 262 of the DGCL, then, as of the later of the Effective Time and the occurrence of such event, such holder's shares shall automatically be converted into and represent only the right to receive the consideration for such shares set forth in Section 2.2(a), without interest, less the Aggregate Allocable Portion of the Escrow Amount, as set forth in Section 2.2(a)(iii) of the Disclosure Schedule, upon surrender of the certificate representing such shares.

(c)     Company shall (i) comply with the requirements of Section 262 of the DGCL, (ii) give Parent prompt notice of any written demand received by Company pursuant to Section 262 of the DGCL, and of withdrawals of such demands, and provide copies of any documents or instruments served pursuant to the DGCL and received by Company and (iii) give Parent the opportunity to participate in all negotiations and proceedings with respect to any such demands.  Company shall not make any payment or settlement offer prior to the Effective Time with respect to any such demand unless Parent shall have consented in writing to such payment or settlement offer.

(d)     Any amount paid by Parent, Company or the Surviving Corporation to any Person with respect to Dissenting Shares pursuant to Section 262 of the DGCL in excess of the amount that would otherwise be payable pursuant to Section 2.2(a) for each such Dissenting Share (such amount, unless determined in a final, non- appealable judgment of a court, being subject to the written approval of the Stockholders' Representative, which approval shall not be unreasonably withheld, conditioned or delayed), and all interest, costs, expenses and fees as incurred by Company, Parent or the Surviving Corporation in connection with the exercise of all rights under Section 262 of the DGCL, shall constitute "Damages" for purposes of this Agreement, and Parent and the Surviving Corporation, as the case may be, shall be entitled to recover such Damages from the Escrow Funds to the extent available therefor and, thereafter, as provided in Article IX.

Section 2.4     Effect of the Merger on Company Options and Unvested Company Restricted Shares.

(a)     Definitions.  For the purposes of this Agreement, a "Vested Company Option" is the portion of a Company Option that is exercisable to acquire shares of Company Common Stock as of immediately prior to the Effective Time (but after giving effect to any acceleration of such Company Options triggered by the transactions contemplated by this Agreement).  An "Unvested Company Option" is the portion of a Company Option that is not exercisable to acquire shares of Company Common Stock as of immediately prior to the Effective Time (but after giving effect to any acceleration of such Company Options triggered by the transactions contemplated by this Agreement).  An "Unvested Company Restricted Share" is a Company Restricted Share that is subject to repurchase by the Company or forfeiture to the

11

GSDOCS\1945236.5

Company as of immediately prior to the Effective Time (but after giving effect to any acceleration of such Company Restricted Share triggered by the transactions contemplated by this Agreement). An "Eligible Vested Company Option" is a Vested Company Option with respect to which Company and the holder thereof have agreed that the cancellation and settlement provisions of Section 2.4(b)(ii) shall apply.

(b)     Prior to the Effective Time, the Board of Directors of Company or any committee administering the Company Stock Plans shall take all actions necessary (including amending any and all Company Stock Plans and any and all awards under such Plans) so that (i) all outstanding Company Options (including any and all outstanding commitments to issue Company Options), whether Vested Company Options or Unvested Company Options, shall be cancelled as of the Effective Time, and (ii) at the Effective Time, each holder of Eligible Vested Company Options shall be entitled to receive, in cancellation and settlement for each share underlying an Eligible Vested Company Option, without interest and subject to applicable withholdings: (I) an amount of cash equal to the Per Share Common Merger Cash Consideration and (II) the Per Share Common Merger Stock Consideration (collectively, the "Vested Option Payment"). All such actions shall be in compliance with the Company Stock Plans and Legal Requirements. Nothing in this Section 2.4 shall be construed to extend or otherwise waive the expiration of any Company Option which has otherwise expired in accordance with their terms. For clarification: (i) no payment shall be made to the holders of Unvested Company Options, or of Vested Company Options that are not Eligible Vested Company Options, in connection with the cancellation of such options as provided in this Section and (ii) Smaller Company Securityholders shall receive additional cash (in lieu of shares of Parent Stock) in exchange for their Eligible Vested Company Options (as provided in the definition of "Per Share Common Merger Stock Consideration.")

(c)     Prior to the Effective Time, the Board of Directors of Company or any committee administering the Company Stock Plans shall take all actions necessary (including amending any and all Company Stock Plans and any and all awards under such Plans) so that all Unvested Company Restricted Shares (including any and all outstanding commitments to issue Company Restricted Shares) shall be canceled as of the Effective Time. All such actions shall be in compliance with the Company Stock Plans and Legal Requirements. Nothing in this Section 2.4 shall be construed to extend or otherwise waive the expiration of any Company Restricted Share which has otherwise expired in accordance with their terms. For clarification, no payment shall be made to the holders of Unvested Company Restricted Shares in connection with the cancellation of such shares as provided in this Section.

(d)     The Company Stock Plans and all awards thereunder shall terminate as of the Effective Time (except the 2008 Stock Incentive Plan, excluding the awards thereunder, shall not terminate and shall continue as a plan of the Surviving Corporation, except that references therein to Company Common Stock shall be deemed to be references to Parent Stock, and reference therein to the Board of Directors of the Company shall be deemed to refer to the Board of Directors of Parent), and the provisions in any other agreement, arrangement or benefit plan providing for the issuance, transfer or grant of any capital stock of Company or any interest in respect of any capital stock of Company shall be cancelled and deleted as of the Effective Time, and Company shall take all such action as is necessary, and obtain all necessary consents, to ensure the foregoing and that, after the Effective Time, no holder of a Company Option or

12

GSDOCS\1945236.5

Company Restricted Share or any participant in or a party to any Company Stock Plan or other agreement, arrangement or benefit plan shall have any right thereunder to acquire any capital stock or any interest in respect of any capital stock of the Surviving Corporation or of the Parent.

(e)    Section 2.4(e) of the Company Disclosure Schedule sets forth the following information with respect to each holder of Company Options and each holder of Company Restricted Shares:

(i)    the Company Options, if any and whether Eligible Vested Company Options, Vested Company Options or Unvested Company Options, and Unvested Company Restricted Shares, if any, held by such holder;

(ii)    the aggregate Vested Option Payment to be paid to such holder, if any, in accordance with the terms hereof and in the manner provided herein in respect of all Eligible Vested Company Options held by such holder as of the date hereof and immediately prior to the Effective Time, subject to withholding for Taxes as described in Section 2.7; provided, however, that Company shall update such calculation two (2) business days prior to the expected Closing Date to give effect to any changes in such calculation required as a result of the passage of time between the date hereof and the Effective Time and the final determination of the amounts and matters that are relevant components of such calculation, including the Total Merger Cash Consideration;

(iii)    such holder's Aggregate Allocable Portion of the Escrow Amount; provided, however, that Company shall update such calculation two (2) business days prior to the expected Closing Date to give effect to any changes in such calculation required as a result of the passage of time between the date hereof and the Effective Time and the final determination of the amounts and matters that are relevant components of such calculation, including the Total Merger Cash Consideration; and

(iv)    the mailing address of such holder.

Section 2.5    Escrow.    At the Effective Time, the Escrow Amount shall be delivered or caused to be delivered by Parent to The Bank of New York Mellon as escrow agent (the "Escrow Agent"), pursuant to the provisions of the escrow agreement in substantially the form attached as Exhibit D hereto, subject to any amendments to such form requested by the Escrow Agent and mutually agreed to by Parent and the Stockholders' Representative (the "Escrow Agreement"). The Escrow Agreement shall be entered into prior to the Effective Time, by and among Parent, the Stockholders' Representative, on behalf of the Escrow Holders, and the Escrow Agent, and shall provide Parent with recourse against amounts held in escrow by the Escrow Agent with respect to Damages and the Indemnifying Holders' indemnification obligations under Section 7.8 and Article IX, subject to the terms and conditions set forth in the Escrow Agreement and in such Section 7.8 and Article IX of this Agreement (the "Escrow Funds"). The Escrow Amount (or any portion thereof) shall be distributed to the Escrow Holders (or, in the case of Escrow Holders that were holders of Eligible Vested Company Options, to the Surviving Corporation for distribution to such Escrow Holders net of applicable withholding amounts) and Parent at the times, and upon the terms and conditions, set forth in the Escrow Agreement. The terms and provisions of the Escrow Agreement and the transactions contemplated thereby are specific

13

GSDOCS\1945236.5

terms of the Merger, and the approval and adoption of this Agreement and approval of the Merger by the holders of Company Stock and, in the case of the Principal Stockholders, their execution and delivery of this Agreement, shall constitute approval by such holders, as to the specific terms of the Merger, and the irrevocable agreement of such holders to be bound by and comply with, the Escrow Agreement and all of the arrangements and provisions of this Agreement relating thereto, including, without limitation, the deposit of the Escrow Amount into escrow, the obligations with respect to Damages, the indemnification obligations set forth in Section 7.8 and Article IX hereof and the appointment and sole authority to act on behalf of such holders of the Stockholders' Representative, as provided for herein and in the Escrow Agreement. The release of the Escrow Funds (or any portion thereof) will occur on the fifteen (15) month anniversary of the Closing, and will be subject to the terms hereof and of the Escrow Agreement.

Section 2.6    Disbursement.

(a)    Paying Agent.    At the Effective Time, Parent or Acquisition Sub shall deposit, or cause to be deposited, with The Bank of New York Mellon (the "Paying Agent") for the benefit of the Company Securityholders: (i) cash and Parent Stock in an amount equal to the Total Company Stockholder Consideration, plus (ii) the aggregate Vested Option Payments payable to holders of Eligible Vested Company Options pursuant to Section 2.4(b) less applicable withholdings, minus (iii) the Escrow Amount, minus (iv) the Stockholder Loan Repayment Amount.    The cash portion shall be invested as directed by Parent or the Surviving Corporation pending payment thereof by the Paying Agent to the Company Securityholders. Earnings from such investments shall be the sole and exclusive property of the Parent, and no part of such earnings shall accrue to the benefit of the Company Securityholders.    At the Effective Time, Parent shall deposit, or cause to be deposited, cash in an amount equal to the aggregate Transaction Expenses (other than Contingent Transaction Expenses) listed on Schedule 2.1(b) and shall direct that the Paying Agent pay the respective amounts to the Persons indicated on such schedule as soon as practicable, but in no event later than two (2) business days following the Effective Time.

(b)    Surrender Procedures.

(i)    As soon as reasonably practicable after the Effective Time, but no later than two (2) business days thereafter, Parent shall instruct the Paying Agent to mail to each Company Stockholder other than Company Guaranty Shareholder (i) a letter of transmittal in substantially the form attached hereto as Exhibit K ("Letter of Transmittal") and (ii) instructions for use in effecting the surrender of certificate(s) formerly representing all of the shares of Company Stock held by such Company Stockholder in exchange for such Company Stockholder's Stockholder Merger Payment (as defined below). The payment of the appropriate Stockholder Merger Payment to any Company Stockholder listed in Section 2.2(a)(iii) of the Company Disclosure Schedule is conditioned upon the due execution and delivery of such Letter of Transmittal. After the Effective Time, within five (5) business days after receipt by the Paying Agent of certificate(s), properly endorsed or otherwise in proper form for transfer, formerly representing all the shares of Company Stock held by any Company Stockholder for cancellation, together with such duly executed Letter of Transmittal, the Paying Agent shall, in exchange therefor and in reliance on the representations and warranties herein, pay to such Company Stockholder an amount equal to such Company Stockholder's aggregate Merger

14

Consideration, as set forth in Section 2.2(a)(iii) of the Company Disclosure Schedule (other than any Earn-Out Payment), less such Company Stockholder's Aggregate Allocable Portion of the Escrow Amount, as set forth in Section 2.2(a)(iii) of the Company Disclosure Schedule (such amount, with respect to each such Company Stockholder, being the "Stockholder Merger Payment"), but without interest, and the certificate(s) so surrendered shall forthwith be canceled. If payment of any portion of the applicable Stockholder Merger Payment is to be made to a Person other than the Person in whose name the surrendered certificate(s) are registered, it shall be a condition of payment that the Person requesting such payment (A) shall have paid any Transfer Taxes and other Taxes required by reason of the payment of those amounts to a Person other than the registered holder of the certificate(s) surrendered, and shall have established to the satisfaction of the Surviving Corporation that such Taxes have been paid, or (B) shall have established to the satisfaction of the Surviving Corporation that such Taxes are not applicable. From and after the Effective Time, until surrendered as contemplated by this Section 2.6(b), each certificate formerly representing shares of Company Stock (other than the Company Guaranty Shares) shall be deemed to represent for all purposes only the right to receive the applicable Merger Consideration, if any, in respect of such shares of Company Stock formerly represented thereby in accordance with the terms hereof and in the manner provided herein.

(ii)     After the Effective Time, within five (5) business days after receipt by the Paying Agent (with a copy to Parent) of a statement or statements from the Surviving Corporation, together with copies of executed option termination agreements from Company Securityholders (who are holders of Eligible Vested Company Options as of the Effective Time) in substantially the form previously agreed between Parent and Company (which termination agreement will include a release in substantially the form previously agreed between Parent and Company) duly executed, the Paying Agent shall, in exchange therefor and in reliance on the representations and warranties herein, pay to the Surviving Corporation for payment to each such Company Securityholder an amount equal to such Company Securityholder's aggregate Vested Option Payment, if any, as set forth in Section 2.4(e) of the Company Disclosure Schedule, less such Company Securityholder's Aggregate Allocable Portion of the Escrow Amount, as set forth in Section 2.4(e) of the Company Disclosure Schedule (such amount, with respect to each such Company Securityholder, being the "Securityholder Merger Payment"), but without interest, and net of applicable withholdings.

(c)     Change in Control Payments.     At the Effective Time, the Surviving Corporation shall, and Parent shall cause to the Surviving Corporation to, pay (or cause to be paid) amounts in cash equal to the respective Change in Control Payments listed in Section 2.1(a) of the Company Disclosure Schedule to the respective Persons indicated on such schedule as soon as practicable, but in no event later than ten (10) business days following the Effective Time. Surviving Corporation shall withhold all applicable Taxes from such Change in Control Payments.

(d)     Transfer Books; No Further Ownership Rights in the Shares.     At the Effective Time, the stock transfer books of Company shall be closed, and thereafter there shall be no further registration of transfers of the shares of Company Stock on the records of Company until reopened by the Surviving Corporation. From and after the Effective Time, the holders of certificates formerly evidencing ownership of the shares of Company Stock outstanding

15

immediately prior to the Effective Time shall cease to have any rights with respect to such shares, except as otherwise provided for herein or by applicable Legal Requirements. After the Effective Time, the Surviving Corporation or the Paying Agent shall cancel and exchange, as provided in this Article II, any presented certificate representing such shares.

(e)     Termination of Fund; No Liability. At any time following six (6) months after the Effective Time, Parent shall be entitled to require the Paying Agent to deliver to it any funds and Parent Stock (including, without limitation, any earnings and dividends received with respect thereto) that had been made available to the Paying Agent and that have not been disbursed to Company Securityholders and thereafter such Company Securityholders shall be entitled to look only to the Surviving Corporation (subject to abandoned property, escheat or other similar Legal Requirements) and only as general creditors thereof with respect to the applicable merger payment, upon and subject to delivery of the duly executed applicable Letter of Transmittal and, with respect to any Company Stockholder, upon due surrender of their certificates formerly representing shares of Company Stock, without any interest thereon. Notwithstanding the foregoing, none of Parent, the Surviving Corporation or the Paying Agent shall be liable to any holder of a certificate formerly representing shares of Company Stock for any amounts delivered to a public official pursuant to any applicable abandoned property, escheat or similar Legal Requirement.

(f)     Lost, Stolen or Destroyed Certificates.  In the event any certificate(s) which formerly represented shares of Company Stock shall have been lost, stolen or destroyed, upon the making and delivery of an affidavit of that fact by the Company Stockholder thereof in form reasonably satisfactory to Parent, Parent shall instruct the Paying Agent to pay such Company Stockholder such Company Stockholder's Stockholder Merger Payment as provided in this Article II; provided, however, that Parent may, in its sole discretion and as a condition precedent to issuing such instruction to the Paying Agent, require the owner of such lost, stolen or destroyed certificate(s) to deliver an agreement of indemnification in form reasonably satisfactory to Parent and a bond in such sum as Parent may reasonably direct as indemnity, against any claim that may be made against Parent, the Surviving Corporation or the Paying Agent with respect to the certificate(s) alleged to have been lost, stolen or destroyed.

(g)     Dissenting Shares. The provisions of this Section 2.6 shall also apply to Dissenting Shares that lose their status as such, except that the obligations of Parent under this Section 2.6 shall commence on the date of loss of such status and the holder of such shares shall be entitled to receive in exchange for such shares the applicable aggregate Merger Consideration less the Aggregate Allocable Portion of the Escrow Amount, as set forth in Section 2.2(a)(iii) of the Company Disclosure Schedule, in accordance with the terms hereof and in the manner provided herein.

(h)     Change in Parent Stock.     If, between the date of this Agreement and the Effective Time, the outstanding shares of Parent Stock are changed into a different number or class of shares by reason of any stock split, division or subdivision of shares, stock dividend, reverse stock split, consolidation of shares, reclassification, recapitalization or other similar event, then the maximum and minimum Average Closing Price set forth in the definition of "Average Closing Price", shall be appropriately adjusted to reflect such change.

16

GSDOCS\1945236.5

(i) <u>Fractional Share</u>. No certificates or scrip representing fractional shares of Parent Stock shall be issued in connection with the Merger, and such fractional interests will not entitle the owner thereof to any rights as a stockholder of the Parent. In lieu of issuing a fractional interest in a share of Parent Stock otherwise required to be paid under this Agreement, each Person who would otherwise have been entitled to receive a fraction of a share of Parent Stock shall receive cash (without interest) in an amount equal to the product of such fractional interest multiplied by the Average Closing Price. For avoidance of doubt, fractional shares of the capital stock of the Surviving Corporation may be issued in connection with the Merger.

(j) <u>Stockholder Loans</u>. At the Effective Time, Parent shall pay to the Surviving Corporation the amount in cash (the "<u>Stockholder Loan Repayment</u>"), set forth on Section 2.6(j) of the Company Disclosure Schedule, equal to the aggregate unpaid principal and unpaid accrued interest on the outstanding notes issued to Company by the Company Stockholders set forth on Section 2.6(j) of the Company Disclosure Schedule in connection with the acquisition by such Persons of shares of Company Stock. Section 2.6(j) of the Company Disclosure Schedule sets forth, for each such borrower, the amount of such unpaid principal and unpaid accrued interest as of the date hereof; provided, however, that Company shall update such calculation two (2) business days prior to the expected Closing Date to show, for each such borrower, the amount of such unpaid principal and unpaid accrued interest as of the Closing Date. Such payment by Parent to the Surviving Corporation of the Stockholder Loan Repayment shall be deemed to be on behalf of such borrowers and, upon the making of such payment, such notes shall be deemed fully repaid and discharged. Parent shall instruct the Paying Agent, with respect to each such borrower, to deduct from such borrower's Stockholder Merger Payment the applicable portion of the Stockholder Loan Payment as set forth on Section 2.6(j) of the Company Disclosure Schedule.

Section 2.7 <u>Withholding Rights</u>. Each of Parent, the Surviving Corporation, the Paying Agent and the Escrow Agent shall be entitled to pay, deduct and withhold from any consideration otherwise payable pursuant to this Agreement to any Company Securityholder, such amounts as may be required to be paid, deducted and/or withheld with respect to the making of such payment under the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder (the "<u>Code</u>"), or any other Legal Requirement. To the extent that amounts are so paid, deducted and/or withheld by Parent, the Surviving Corporation, the Paying Agent or the Escrow Agent, such amounts shall be treated for all purposes of this Agreement as having been paid to the Company Securityholder in respect of which such payment, deduction or withholding was made. With respect to withholdings required to be made on Parent Stock issued to a holder of an Eligible Vested Company Option pursuant to Section 2.4, Parent agrees to withhold shares of Parent Stock (in lieu of cash) in an amount equal to the amount required to be withheld on account of the Parent Stock divided by the Average Closing Price.

Section 2.8 <u>Unclaimed Amounts</u>. Any amounts remaining unclaimed by Company Securityholders two (2) years after the Effective Time (or such earlier date, immediately prior to such time when the amounts would otherwise escheat to or become the property of any Governmental Entity (as defined in Section 3.4)) shall become, to the extent permitted by

17

applicable Legal Requirements, the property of Parent, free and clear of any claims or interest of any Person previously entitled thereto.

Section 2.9    Earn-Out Payments.

(a)    Subject to the terms and conditions of this Agreement, Earn-Out Eligible Holders shall be entitled to additional consideration, if any, up to a maximum aggregate not to exceed One Hundred and Seventy Million Dollars ($170,000,000), based upon the Surviving Corporation's Adjusted EBITDA for Fiscal Year 2010, Fiscal Year 2011 and Fiscal Year 2012, subject to acceleration upon certain events as provided in this Section 2.9 (collectively, the "Earn-Out Payments") payable in cash and, as provided in Section 2.9(g), Parent Stock, in accordance with this Section.

(b)    For purposes of this Section 2.9, the following terms shall have the following meanings:

"Adjusted EBITDA" means, with respect to any Fiscal Year, the consolidated earnings before interest, taxes, depreciation and amortization of the Surviving Corporation and its subsidiaries, the components of which, and the amounts of such components, are determined in accordance with GAAP, subject to the adjustments, limitations, agreements and clarifications set forth in Section 2.9(k) and Schedule 2.9(k).

"Aggregate Cap" means (i) with respect to the 2010 Earn-Out Payment,  Forty Million Dollars ($40,000,000); (ii) with respect to the 2011 Earn-Out Payment, Ninety-Five Million Dollars ($95,000,000) minus the 2010 Earn-Out Payment, if any; and (iii) with respect to the 2012 Earn-Out Payment, One Hundred and Seventy Million Dollars ($170,000,000) minus the sum of the 2010 Earn-Out Payment and 2011 Earn-Out Payment, if any.

"Company Executives" means Benjamin D. Fischman and Edward M. McNamara, so long as either of them is employed by the Surviving Corporation, and their successors if neither of them is employed by the Surviving Corporation.

"Earn-Out Eligible Holder" means (a) each Company Stockholder, and each such Person's successors and permitted assigns, if any; and (b) with respect to a Fiscal Year, each Eligible Employee eligible to receive a bonus under the Incentive Bonus Plan with respect to such Fiscal Year.

"Earn-Out Period" means Fiscal Year 2010, Fiscal Year 2011 and Fiscal Year 2012.

"Eligible Employees" shall have the meaning ascribed to such term in the Incentive Bonus Plan (as defined in Section 7.12).

"Fiscal Year" means a fiscal year of Parent;  "Fiscal Year 2010" means the fiscal year of Parent ending January 1, 2011; "Fiscal Year 2011" means the fiscal year of Parent ending December 31, 2011 and "Fiscal Year 2012" means the fiscal year of Parent ending December 29, 2012.

"Incentive Bonus Plan Amount" means each of the 2010 Incentive Bonus Plan Amount, 2011 Incentive Bonus Plan Amount, 2012 Incentive Bonus Plan Amount and Accelerated Incentive Bonus Plan Amount (each as defined below), if any.

18

GSDOCS\1945236.5

"Stockholder Earn-Out Payment" means each of the 2010 Stockholder Earn-Out Payment, 2011 Stockholder Earn-Out Payment, 2012 Stockholder Earn-Out Payment and Accelerated Stockholder Earn-Out Payment (each as defined below), if any.

(c) The Earn-Out Payments shall be calculated as follows:

(i) The Earn-Out Payment, if any, for Fiscal Year 2010 (the "2010 Earn-Out Payment") shall equal the result (if a positive number) of: (A) the product of the Adjusted EBITDA for Fiscal Year 2010 multiplied by twelve (12); minus (B) One Hundred and Eighty Million Dollars ($180,000,000); provided, however, that in no event shall the 2010 Earn-Out Payment exceed the applicable Aggregate Cap for the 2010 Fiscal Year. The 2010 Earn-Out Payment, if any, after deducting any Contingent Transaction Expenses, shall be divided into an amount to be paid to Company Stockholders (the "2010 Stockholder Earn-Out Payment") and an amount to be paid to Eligible Employees under the Incentive Bonus Plan (the "2010 Incentive Bonus Plan Amount") as provided in Schedule 2.9(f) attached hereto.

(ii) The Earn-Out Payment, if any, for Fiscal Year 2011 (the "2011 Earn-Out Payment") shall equal the result (if a positive number) of: (A) the product of the Adjusted EBITDA for Fiscal Year 2011 multiplied by eight (8); minus (B) the sum of (I) One Hundred and Eighty Million Dollars ($180,000,000)plus (II) the 2010 Earn-Out Payment, if any; provided, however, that in no event shall the 2011 Earn-Out Payment exceed the applicable Aggregate Cap for the 2011 Fiscal Year. The 2011 Earn-Out Payment, if any, after deducting any Contingent Transaction Expenses, shall be divided into an amount to be paid to Company Stockholders (the "2011 Stockholder Earn-Out Payment") and an amount to be paid to Eligible Employees under the Incentive Bonus Plan (the "2011 Incentive Bonus Plan Amount") as provided in Schedule 2.9(f) attached hereto.

(iii) The Earn-Out Payment, if any, for Fiscal Year 2012 (the "2012 Earn-Out Payment") shall equal the result (if a positive number) of: (A) the product of the Adjusted EBITDA for Fiscal Year 2012 multiplied by six and seventy-five hundredths (6.75); minus (B) the sum of (I) One Hundred and Eighty Million Dollars ($180,000,000) plus (II) the sum of the 2010 Earn-Out Payment and 2011 Earn-Out Payment, if any; provided, however, that in no event shall the 2012 Earn-Out Payment exceed the applicable Aggregate Cap for the 2012 Fiscal Year. The 2012 Earn-Out Payment, if any, after deducting any Contingent Transaction Expenses, shall be divided into an amount to be paid to Company Stockholders (the "2012 Stockholder Earn-Out Payment") and an amount to be paid to Eligible Employees under the Incentive Bonus Plan (the "2012 Incentive Bonus Plan Amount") as provided in Schedule 2.9(f) attached hereto. Parent shall, or shall cause the Surviving Corporation, to maintain all books, records and documentation detailing the calculation of Adjusted EBITDA until 2015.

(iv) The Contingent Transaction Expenses, if any, payable with respect to the Earn-Out Payment, if any, for any Fiscal Year shall be paid out of, and deducted from, such Earn-Out Payment, as provided below.

(d) As soon as reasonably practicable after the completion of each Fiscal Year within the Earn-Out Period, but in no event later than ten (10) days after the completion of the audit of Parent's consolidated financial statements for such Fiscal Year, Parent shall prepare and deliver to the Stockholders' Representative a statement (an "Adjusted EBITDA Statement")

19

certified by Parent's chief financial officer, setting forth in reasonable detail the Parent's calculation of Adjusted EBITDA for such Fiscal Year and the calculation of the Earn-Out Payment, if any, for such Fiscal Year (including any Contingent Transaction Expenses to be deducted therefrom). In the event that the Stockholders' Representative objects to Adjusted EBITDA and/or the calculation of the Earn-Out Payment, if any, for such Fiscal Year (collectively, the "Disputed Amounts") set forth in the Adjusted EBITDA Statement, then within thirty (30) days after the delivery to the Stockholders' Representative of the Adjusted EBITDA Statement (the "Response Period"), the Stockholders' Representative shall deliver to Parent (with a copy to the Surviving Corporation) a written notice (an "Objection Notice") describing in reasonable detail the Stockholders' Representative's objections to the Adjusted EBITDA Statement and/or the calculation of the Earn-Out Payment, if any, for such Fiscal Year and setting forth the Surviving Corporation's Adjusted EBITDA and/or the calculation of the Earn-Out Payment, if any, for such Fiscal Year determined by the Stockholders' Representative to be correct. During the Response Period, the Stockholders' Representative and its representatives and advisors shall have reasonable access, subject to an appropriate confidentiality agreement, to the Surviving Corporation's books and records relating to the Adjusted EBITDA calculation and/or the calculation of any applicable Contingent Transaction Expenses during normal business hours and upon reasonable notice, and to the employees, representatives and agents of Parent and the Surviving Corporation who prepared, or assisted in the preparation of, such calculation. If the Stockholders' Representative does not deliver an Objection Notice to Parent during the Response Period, or if the Stockholders' Representative sends written notice to Parent prior to the end of the Response Period that it accepts the Adjusted EBITDA Statement (an "Acceptance Notice"), then the Parent's calculation of the Adjusted EBITDA and the calculation of the Earn-Out Payment, if any, for such Fiscal Year shall be binding and conclusive on Parent, any and all Earn-Out Eligible Holders and the Stockholders' Representative.

In the event the Stockholders' Representative delivers to Parent an Objection Notice within the Response Period, Parent and the Stockholders' Representative shall in good faith negotiate to settle the Disputed Amounts and Parent shall distribute any amount of an Earn-Out Payment that is not a Disputed Amount (an "Acceptable Amount") in accordance with Section 2.9(e). If no resolution is reached within thirty (30) days after delivery of the Objection Notice to Parent, then the Disputed Amounts shall be finally settled by an independent nationally recognized accounting firm (the "Accountant") (which shall not be PriceWaterhouseCoopers LLP nor Deloitte & Touche LLP) jointly selected and engaged by Parent and the Stockholders' Representative. Parent, the Surviving Corporation and the Stockholders' Representative shall promptly provide to the Accountant such information as the Accountant may reasonably request in connection with its determination. As promptly as practicable after the engagement of the Accountant, Parent and the Stockholders' Representative may each prepare and submit a presentation to the Accountant. The Accountant shall act as an expert and not as an arbitrator and all determinations made by the Accountant of the Adjusted EBITDA and/or the calculation of the Earn-Out Payment, if any, for such Fiscal Year shall, in the absence of manifest error, be final, binding and conclusive on Parent, the Surviving Corporation, any and all Earn-Out Eligible Holders and the Stockholders' Representative. Parent and the Stockholders' Representative shall each pay fifty percent (50%) of the fees and expenses of the Accountant for its services under this Section 2.9(d). Such fees and expenses of the Accountant payable by Stockholders' Representative shall be treated as an expense of the Stockholders' Representative that is reimbursable under the Escrow Agreement and, if insufficient Escrow Funds are available to

20

GSDOCS\1945236.5

fully reimburse the Stockholders' Representative, the unreimbursed portion shall be treated as a Contingent Transaction Expense. Parent and the Stockholders' Representative agree that the procedure set forth in this Section 2.9(d) for resolving disputes shall be the sole and exclusive method for resolving any such disputes regarding calculation of Adjusted EBITDA and the Earn-Out Payment, if any; provided that this provision shall not prohibit either Parent or the Stockholders' Representative from instituting litigation to enforce any ruling of the Accountant.

(e)     Within ten (10) days after the Adjusted EBITDA and the calculation of the Earn-Out Payment, if any, for such Fiscal Year becomes binding and conclusive pursuant to Section 2.9(d) (which, for clarity, means when (i) the Stockholders' Representative delivers an Acceptance Notice with respect to the whole Earn-Out Payment, (ii) the Stockholders' Representative delivers an Objection Notice with respect to a Disputed Amount, but also delivers an Acceptance Notice with respect to an Acceptable Amount, (iii) the Stockholders' Representative does not deliver an Objection Notice within the Response Period or (iv) the Accountant notifies Parent and the Stockholders' Representative of its determination of Adjusted EBITDA and the Earn-Out Payment, if any), Parent shall (1) determine which portion of the Earn-Out Payment for such Fiscal Year (other than any Disputed Amount), after deduction of applicable Contingent Transaction Expenses, if any constitutes the Stockholder Earn-Out Payment for such Fiscal Year and which portion constitutes the Incentive Bonus Plan Amount for such Fiscal Year (2) pay the Stockholder Earn-Out Payment for such Fiscal Year to the Paying Agent for distribution to the Company Stockholders as provided in Schedule 2.9(f) and (3) pay the Incentive Bonus Plan Amount for such Fiscal Year to the Surviving Corporation for distribution to the Eligible Employees as provided in the Incentive Bonus Plan. If any Contingent Transaction Expenses are payable with respect to the aggregate portion of the Earn-Out Payment for such Fiscal Year, then Parent shall deduct from the aggregate portion of the Earn-Out Payment for such Fiscal Year the amount of such Contingent Transaction Expenses attributable to such portion of the Earn-Out Payment and distribute such amount to the Paying Agent for further distribution to the Person or Persons to whom they are owed.

(f)     The amount of any Stockholder Earn-Out Payment to be paid to each Company Stockholder and the amount of any Incentive Bonus Plan Amount to be paid to the Eligible Employees shall be calculated and allocated as provided in Schedule 2.9(f) (the "Earn-Out Allocation Schedule"), subject to the conditions and limitations set forth therein, which Schedule has been determined solely by the Company and the Company's Board of Directors.

(g)     With respect to that portion of the Stockholder Earn-Out Payment to be paid to a Company Stockholder who is an employee of the Company as of the Effective Time as shown on Schedule 2.9(f) and with respect to the Incentive Bonus Plan Amount to be paid to Eligible Employees, Parent shall have the option, in its sole discretion, to pay, in lieu of cash, up to 50% of such payment (the "Stock Election Amount") through the issuance of a number of shares of Parent Stock (rounded down to the nearest whole number of shares with cash paid in lieu of issuing any fractional shares) equal to the Stock Election Amount divided by the average of the closing prices of Parent Stock as reported on the Nasdaq Global Select Market for the ten (10) Trading Days ending on and including the third Trading Day prior to the date the Earn-Out Payment is scheduled to be paid; provided that in the event of an Elective Termination, Parent shall pay any portion of any Accelerated Incentive Bonus Plan Amount payable to Benjamin D.

21

GSDOCS\1945236.5

Fischman, to the extent required to be deferred under the Incentive Bonus Plan pursuant to Section 409A of the Code, in cash and not in Parent Stock.

(h)     Parent and the Surviving Corporation shall be entitled to deduct and withhold from the amounts otherwise payable pursuant to this Section 2.9 such amounts as Parent or the Surviving Corporation is required to pay, deduct and/or withhold with respect to the making of such payment under the Code, or any provision of state, local or foreign tax Law, and the Parent or Surviving Corporation, as applicable, shall make any required filings with and payments to tax authorities relating to any such deduction or withholding.  To the extent that amounts are so paid, deducted and/or withheld by the Parent or the Surviving Corporation, such amounts shall be treated for all purposes of this Agreement as having been paid to the Earn-Out Eligible Holder in respect of which such deduction and withholding was made.

(i)     [Intentionally Omitted]

(j)     [Intentionally Omitted]

(k)     During the period of time from the Effective Time through the end of Fiscal Year 2012, subject to Schedule 2.9(k):

(i)     Subject to the further provisions of this Section 2.9(k), Surviving Corporation shall operate as a stand-alone operation with the goal of meeting or exceeding the levels of Adjusted EBITDA that would result in the full Earn-Out Payments being distributed in each Fiscal Year.  Surviving Corporation shall operate under the supervision and control of the Company Executives.  In operating the business, the Surviving Corporation shall comply, and the Company Executives shall cause Surviving Corporation to comply, with Parent's policies and procedures as generally applicable to all subsidiaries, divisions, units and groups of Parent (for example, code of conduct, insider trading, compensation approval and anti-trust), provided such policies or procedures are customary in other comparable companies.  Surviving Corporation will, and the Company Executives will cause Surviving Corporation to, participate in the Parent's budgeting and forecasting process on the same basis as Parent's other subsidiaries, divisions, units or groups with 100 or more employees.  Surviving Corporation will prepare, and the Company Executives shall cause the Surviving Corporation to prepare, an annual operating plan that will include, at a minimum, (1) business strategy and objectives, (2) personnel changes, deletions and additions, and compensation and benefits budgets, (3) revenue plans, (4) expense plans, (5) capital expenditure plans and (6) facility utilization and projected capacity needs that reflect, in the Surviving Corporation's reasonable judgment, a plan that will meet or exceed the levels of Adjusted EBITDA that would result in the full Earn-Out Payments being earned in each Fiscal Year during the Earn-Out Period (the "Annual Operating Plan").  Each Annual Operating Plan shall be subject to the approval of Parent, which shall not unreasonably withheld, conditioned or delayed.  Each Annual Operating Plan shall be updated quarterly during Parent's re-forecasting process by Surviving Corporation.  Any material changes to the Annual Operating Plan (including any changes to any updates to such Annual Operating Plan pursuant to the previous sentence) shall be subject to the approval of Parent, which shall not be unreasonably withheld, conditioned or delayed.  Subject to compliance with the provisions of this Section 2.9(k), Surviving Corporation shall have full authority to operate the business within the parameters of the approved Annual Operating Plan (as the same may be

22

GSDOCS\1945236.5

updated as described in this Section 2.9(k)(i)). Throughout the Earn Out Period, the Parent Group shall provide access to funds and credit facilities suitable to enable Surviving Corporation to meet its working capital requirements, including without limitation, requirements to fund and secure inventory purchases and post letters of credit to support facility expansion and general corporate matters consistent with the Annual Operating Plan (as the same may be updated as described in this Section 2.9(k)(i)).

        (ii)     Subject to Schedule 2.9(k)(ii), the Surviving Corporation shall use the Parent and its current and future subsidiaries (collectively, "Parent Group") for fulfillment, call center and freight services (as soon as reasonably practicable after the Closing), and shall continue to use the Parent Group for email marketing services.

        (iii)    Neither Parent nor Company Executives, nor Surviving Corporation (if Company Executives are no longer employed at Surviving Corporation) shall (or permit any of its Authorized Representatives to) operate the business of the Surviving Corporation and its subsidiaries in a manner that would, or would reasonably be expected to, substantially obstruct, prevent or otherwise materially adversely affect the ability of the Surviving Corporation to attain Adjusted EBITDA in respect of Fiscal Year 2010, Fiscal Year 2011 and Fiscal Year 2012 to the effect of Parent not paying the Aggregate Caps for each year or in the aggregate for all three years.

        (iv)    Any and all corporate expenses or services allocated or provided to the Surviving Corporation by the Parent Group after the Effective Time, including any corporate expenses incurred by Surviving Corporation or any member of the Parent Group relating to any legal or regulatory compliance programs, controls or procedures in respect of Surviving Corporation's business and operations, (A) shall be consistent with, and determined on the same basis as, the allocations to Parent Group's other subsidiaries, divisions, units or groups with 100 or more employees, as reasonably determined by Parent's general counsel or chief financial officer, (B) shall be charged to the Surviving Corporation at the Parent Group's cost and (C) shall be included for purposes of calculating the Adjusted EBITDA; provided, however, that the Surviving Corporation shall not be charged for any corporate expenses it or the Parent Group incurs as a result of compliance with SEC, Nasdaq or other regulatory requirements specific to public companies.

        (v)    To the extent the Surviving Corporation shall realize cost savings as a result of the corporate expenses and services allocated or provided by Parent, such savings shall be included in the calculation of Adjusted EBITDA.

        (vi)    The chief financial officer, controller or senior vice president-finance of Parent, the chief financial officer of the Surviving Corporation and Stockholders' Representative shall meet on a quarterly basis (within 45 days after the end of each fiscal quarter) to review the financial results of the Surviving Corporation and the Adjusted EBITDA calculation for the prior quarter. During such review, the Stockholders' Representative and its representatives and advisors shall have reasonable access, subject to an appropriate confidentiality agreement, to the Surviving Corporation's books and records relating to the Adjusted EBITDA calculation and to the employees, representatives and agents of Parent and the Surviving Corporation who prepared, or assisted in the preparation of, such calculation.

23

(vii)    Upon request of Surviving Corporation, the Parent Group will use all commercially reasonable efforts to take actions reasonably requested by Surviving Corporation to assist Surviving Corporation to increase revenue and decrease costs, including the following:

(A)    The Parent Group shall use commercially reasonable efforts to introduce the Surviving Corporation to clients of the Parent Group so that the Surviving Corporation may enter into relationships to sell products of those clients (it being understood that Parent makes no guarantee that such clients will enter into such relationships).    To the extent the Surviving Corporation shall realize revenue from any client relationships of the Parent Group, such revenue and related earnings shall be included in the calculation of Adjusted EBITDA; and

(B)    The Parent Group shall use commercially reasonable efforts to enable Surviving Corporation to realize cost savings as a result of becoming part of the Parent Group (except as set forth in Section 2.9(k)(x)).    Subject to Schedule 2.9(k), the Surviving Corporation shall not, and the Company Executives shall cause Surviving Corporation not to, take any actions not reflected in the Annual Operating Plan (as the same may be updated as described in Section 2.9(k)(i)), or fail to take any actions they would otherwise take in the ordinary course of business, to artificially increase Adjusted EBITDA during any Fiscal Year during the Earn-Out Period (including, for example, the Surviving Corporation shall not reduce the salaries of senior management of the Surviving Corporation or fail to recognize any expense for which an employee or contractor is entitled to be reimbursed in the Fiscal Year in which such expense was incurred).

(viii)    If any one-time out-of-pocket expense (e.g., a contract termination fee) incurred by the Surviving Corporation in a Fiscal Year in order to generate cost savings ("Synergy Expense") exceeds the associated cost savings to the Surviving Corporation for the Fiscal Year in which such expense is incurred ("Annual Synergy Savings"), for purposes of calculating Adjusted EBITDA, the expense charged to the Surviving Corporation for such Synergy Expense in the Fiscal Year in which such Synergy Expense is incurred may, at the option of Surviving Corporation,  be reduced to an amount equal to the associated Annual Synergy Savings and netted against the associated Annual Synergy Savings and, in such event, the amount by which any Synergy Expense exceeded the associated Annual Synergy Savings shall be carried over and shall be an expense of the Surviving Corporation in the subsequent Fiscal Year for purposes of calculating Adjusted EBITDA for such subsequent Fiscal Year.

(ix)    The Surviving Corporation's capital expenditures, net of reimbursements and any capital expenditures related to moving call center, fulfillment and freight operations to the Parent Group where applicable, for Fiscal Year 2010, Fiscal Year 2011 and Fiscal Year 2012 shall not exceed the amount specified in the table below (the "Cap-X Limit").  If in any Fiscal Year, the Surviving Corporation's capital expenditures exceed the Cap-X Limit for such Fiscal Year, the amount by which the Surviving Corporation's actual capital expenditures exceed the Cap-X Limit shall be an expense to the Surviving Corporation in that Fiscal Year for purposes of calculating EBITDA.

24

| Fiscal Year | Cap-X Limit |
|-------------|-------------|
| 2010 | $5.0 million |
| 2011 | $6.0 million |
| 2012 | $6.0 million |

(x)     During the Earn-Out Period, no member of the Parent Group (other than Surviving Corporation) shall provide compensation or benefits to employees of the Surviving Corporation (whether in the form of cash, equity or otherwise) without the prior written consent of the Surviving Corporation (as determined by the Company Executives).  Prior to any such compensation or benefits being paid pursuant to the prior sentence, Parent, the Surviving Corporation (as determined by the Company Executives) and the Stockholders' Representative will agree on how such compensation or benefits will be treated for purposes of calculating Adjusted EBITDA.   In addition, the expenses set forth in Section (x) of Schedule 2.9(k) shall not be included for purposes of calculating Adjusted EDITDA.

(xi)     The Surviving Corporation may not enter into or consummate any acquisition (whether by purchase of stock or assets, merger or otherwise) without the prior written consent of the Parent and the Stockholders' Representative.  Prior to the grant of any such consent or approval, Surviving Corporation (as represented by the Company Executives), Parent and the Stockholders' Representative shall confer and mutually agree upon the impact of such acquisition and the related revenues and expenses on the calculation of Adjusted EBITDA.

(xii)     Any changes in the accounting practices or policies of the Surviving Corporation in a manner inconsistent with those accounting practices and policies of the Company that were consistent with GAAP and used in the preparation of the Company's Financial Statements (as defined in Section 3.5), which has the effect of increasing or decreasing Adjusted EBITDA during the Earn-Out Period, shall be disregarded.  The acceleration of the recognition of any revenue or expense, or the postponement, deferral or avoidance of the incurrence of any revenue, expense or cost, by Surviving Corporation, other than in the ordinary course of business of Surviving Corporation in accordance with GAAP as applied by Parent, which has the effect of increasing or decreasing Adjusted EBITDA during the Earn-Out Period, shall be disregarded, and such revenue, expense or cost shall be deemed recognized or incurred during the period when it would otherwise be recognized or incurred.

(l)     If a Parent Change of Control (as defined below) or a Surviving Corporation Change of Control (as defined below) occurs, (i) Parent shall pay an accelerated Earn-Out Payment (as calculated below) as provided in this Section (an "Accelerated Earn-Out Payment") and (ii) the calculation for any remaining Earn-Out Payments in the Earn-Out Period shall be adjusted as provided in this Section.

(i)     The "Acceleration Percentage" shall mean:

(a) If a Surviving Corporation Change of Control occurs:

(A) between the Effective Time and the last day of Fiscal 2010, 50%;

25

(B) during Fiscal 2011, 50% if the 2010 Earn Out Payment is equal to or greater than fifty percent (50%) of the 2010 Aggregate Cap; or 0% if the 2010 Earn Out Payment is less than fifty percent (50%) of the 2010 Aggregate Cap;

(C) during Fiscal 2012, 50% if the sum of (x) the 2010 Earn-Out Payment and (y) the 2011 Earn Out Payment is equal to or greater than fifty percent (50%) of the sum of the Aggregate Caps for Fiscal 2010 and 2011; or 0% if the sum of (x) the 2010 Earn Out Payment and (y) the 2011 Earn Out Payment is less than fifty percent (50%) of the sum of the Aggregate Caps for Fiscal 2010 and 2011.

(b) If a Parent Corporation Change of Control occurs:

(A) between the Effective Time and the last day of Fiscal 2010, 50%;

(B) during Fiscal 2011, the lesser of (x) the quotient obtained by dividing the 2010 Earn Out Payment by the 2010 Aggregate Cap and (y) 50%;

(C) during Fiscal 2012, the lesser of (x) the quotient obtained by dividing the sum of (a) the 2010 Earn Out Payment and (b) the 2011 Earn Out Payment by the sum of the Aggregate Caps for Fiscal 2010 and 2011 and (y) 50%.

(ii)     Following a Parent Change of Control or Surviving Corporation Change of Control, as the case may be, an Accelerated Earn-Out Payment in the amount equal to Acceleration Percentage multiplied by the sum of the Aggregate Caps for all subsequent Fiscal Years for which Earn-Outs are to be determined shall be paid as provided below.

(iii)    The Earn-Out Payments, if any, for Fiscal Years including and following the year in which the Accelerated Earn-Out Payment is payable, shall be determined by multiplying any such Earn-Out Payment otherwise calculated pursuant to Section 2.9(c) by 100% minus the Acceleration Percentage.

(iv)    Notwithstanding the foregoing, if (i) a Surviving Corporation Change of Control shall occur and (ii) the present value of the consideration to be received by Parent in connection with the Surviving Corporation Change of Control ("Parent Proceeds") exceeds the sum of (a) One Hundred and Eighty Million Dollars ($180,000,000) plus (b) the Earn Out Payments, if any, earned prior to the date of the Surviving Corporation Change of Control (the sum of clause (a) plus clause (b) shall be the "Prior Payments"), Parent shall pay an Accelerated Earn-Out Payment as an alternative to the amount payable as determined in clause (ii) (the "Alternative Payment") (but only if the Alternative Payment exceeds the amount payable as determined in clause (ii)) in an amount equal to (a) Parent Proceeds minus the Prior Payments; provided however, that the Alternative Payment plus the Earn-Out Payments, if any, earned prior to the date of the Surviving Corporation Change of Control may not exceed One Hundred Seventy Million Dollars ($170,000,000). The amount of the Alternative Payment, if any, shall be credited against and deducted from the Earn Out Payments, if any, as earned after

26

the date of such Surviving Corporation Change of Control on a dollar for dollar basis until the amount of such Alternative Payment has been exhausted.

(v)    Parent shall distribute the Accelerated Earn-Out Payment within ten (10) days after the closing of a Parent Corporation Change of Control or a Surviving Corporation Change of Control. Such payment may be made in cash and shares of Parent Stock as provided in Section 2.9(g). Parent shall (1) determine which portion of the Accelerated Earn-Out Payment, after deduction of applicable Contingent Transaction Expenses, if any constitutes the Accelerated Stockholder Earn-Out Payment and which portion constitutes the Accelerated Incentive Bonus Plan Amount, (2) pay the Accelerated Stockholder Earn-Out Payment to the Paying Agent for distribution to the Company Stockholders as provided in Schedule 2.9(f) and (3) pay the Accelerated Incentive Bonus Plan Amount to the Surviving Corporation for distribution to the Eligible Employees as provided in the Incentive Bonus Plan. If any Contingent Transaction Expenses are payable with respect to such Accelerated Earn-Out Payment, then Parent shall deduct from the Accelerated Earn-Out Payment the amount of such Contingent Transaction Expenses attributable to such Accelerated Earn-Out Payment and distribute such amount to the Paying Agent for further distribution to the Person or Persons to whom they are owed.

(vi)    For the purposes of this Section, the following terms shall have the following meanings:

"Parent Corporation Change of Control" means any sale of voting securities or sale of assets (whether by sale, merger, consolidation, share exchange, or otherwise in one transaction or a series of transactions) of Parent that results in any third party that is not a stockholder of Parent immediately prior to the Closing becoming the owner of securities of the Parent representing over fifty percent (50%) of the combined voting power of Parent's then outstanding securities or all or substantially all of Parent's assets.

"Surviving Corporation Change of Control" means any sale of voting securities or sale of assets (whether by sale, merger, consolidation, share exchange, or otherwise in one transaction or a series of transactions) of Surviving Corporation that results in any third party (other than a direct or indirect subsidiary of Parent) becoming the owner of securities of the Surviving Corporation representing over fifty percent (50%) of the combined voting power of Surviving Corporation's then outstanding securities or all or substantially all of Surviving Corporation's assets.

(vii)    Parent shall not effect a Surviving Corporation Change of Control unless: (A) the Parent obtains the written agreement of the acquiring surviving, successor or other Person (the "Successor") to assume or guarantee, as applicable, the remaining obligations of Parent under this Section 2.9 and (B) such Successor has a net worth equal to or greater than Parent (as demonstrated by each entity's most recently audited balance sheet). In such event, Parent's obligations under this Section 2.9 shall be released and discharged.

(viii)    For the avoidance of doubt, in no event shall the Accelerated Earn-Out Payment and the other Earn-Out Payments under this Section 2.9 exceed $170,000,000.

27

GSDOCS\1945236.5

(m)    Parent may in its sole discretion, upon ten (10) business days written notice to the Stockholders' Representative, terminate the obligations of Parent and its affiliates under this Section 2.9 in exchange for payment by Parent to Stockholders' Representative of an amount equal to the One Hundred and Seventy Million Dollars ($170,000,000) minus the sum of all Earn-Out Payments paid prior to the date of such notice (the "Elective Termination"). Such payment may be made in cash and shares of Parent Stock as provided in Section 2.9(g). For avoidance of doubt, such payment shall also be considered an "Accelerated Earn-Out Payment" for purposes of this Agreement and shall be paid as provided in Section 2.9(l)(v).

(n)    The interests, if any, of any Earn-Out Eligible Holder  in such Earn-Out Eligible Holder's portion of the Earn-Out Payments, if any, pursuant to this Section 2.9 shall not be assignable or transferable, except by operation of law; provided, however, any Earn-Out Eligible Holder that is an entity may assign its rights to its equity holders in proportion to their equity interests in the entity (it being understood that any attempted assignment or transfer in violation of this Section 2.9(m) shall be null and void). Notwithstanding the foregoing, any Earn-Out Payments that become payable at or after the death of an Earn-Out Eligible Holder shall be paid to the Earn-Out Eligible Holder's beneficiary or beneficiaries named in the most recent designation that the Earn-Out Eligible Holder filed with the Stockholders' Representative (or, in the case of any Earn-Out Payments payable under the Incentive Bonus Plan, the Administrator of such Plan) prior to the Earn-Out Eligible Holder's death; provided that if the Earn-Out Eligible Holder made no such designation or no such beneficiary survives the Earn-Out Eligible Holder, then all such post-death Earn-Out Payments shall be made to the Earn-Out Eligible Holder's estate. Any such designation shall be made in writing on a form provided or approved by the Stockholders' Representative or such Administrator, as the case may be, shall automatically revoke any prior designation made by such Earn-Out Eligible Holder, and shall not be effective until actually received by the Stockholders' Representative or such Administrator, as the case may be. If the deceased Earn-Out Eligible Holder was an employee of the Surviving Corporation or its subsidiaries as of the date of death, any future Earn-Out Payments to such beneficiaries or estate may continue to include the Stock Election Amount, subject to the limitations set forth in Section 2.9(g). Notwithstanding the foregoing, the right of Eligible Employees or their beneficiaries or estates to receive payment in respect of any Earn-Out Payments payable under the Incentive Bonus Plan in the event of the death of the Eligible Employee shall be subject in all events to the terms and conditions of the Incentive Bonus Plan.

(o)    Until final determination and payment (if any) of the 2012 Earn-Out Payment, Parent shall not, and members of the Parent Group shall not, enter into or permit to exist any agreement, contract, or other commitment that prohibits Parent from paying the Earn-Out Payments in accordance with the terms of this Agreement (whether paid entirely in cash or paid partly in shares of Parent Stock). If at any time an Earn-Out Payment is not paid when due hereunder, in addition to all other rights and remedies the Company may have, Parent agrees that interest shall accrue on any such overdue payment at a non-compounding annual rate of twelve percent (12%).

28

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF COMPANY

Knowing that Parent and Acquisition Sub are relying thereon, Company represents and warrants to Parent and Acquisition Sub as follows, subject, in any case, to the exceptions provided in the Company Disclosure Schedule:

Section 3.1     Organization and Qualification; Subsidiaries.

(a)     Section 3.1(a) of the Company Disclosure Schedule contains a complete and accurate list of each subsidiary of Company as of the date hereof and its respective jurisdiction of incorporation or organization, as the case may be and the capitalization of each such subsidiary. Each of Company and its subsidiaries is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its businesses as now being conducted. Company has heretofore delivered to Parent accurate and complete copies of the certificates of incorporation and bylaws (or similar governing documents), as currently in effect, of each of Company and its subsidiaries. The respective articles of incorporation and bylaws or other organizational documents of the subsidiaries of Company do not contain any provision limiting or otherwise restricting the ability of Company to control such subsidiaries. Company does not own or control, directly or indirectly, any equity or similar interest in, or any interest convertible into or exchangeable or exercisable for any equity or similar interest in, or have any commitment or obligation to invest in, purchase any securities or obligations of, fund, guarantee, contribute or maintain the capital of or otherwise financially support any corporation, partnership, joint venture or other business association or entity other than the subsidiaries of Company identified on Section 3.1(a) of the Company Disclosure Schedule.

(b)     Each of Company and its subsidiaries is duly qualified or licensed and in good standing to do business in each jurisdiction in which the property owned, leased or operated by it or the nature of the business conducted by it makes such qualification or licensing necessary, except in such jurisdictions where the failure to be so duly qualified or licensed and in good standing has not had and would not reasonably be expected to have, either individually or in the aggregate, a Company Material Adverse Effect. The term "Company Material Adverse Effect" means (x) a material adverse effect on the business, assets (whether tangible or intangible), results of operations, prospects or condition (financial or otherwise) of Company and its subsidiaries, taken as whole; provided, however, that no event, effect, change, development, circumstance, condition or occurrence arising out of the following, shall be deemed in themselves, either alone or in combination, to constitute, and none of them shall be taken into account in determining whether there has been, or would reasonably be expected to be, a Company Material Adverse Effect: (i) general economic conditions; (ii) conditions generally affecting industries in which Company operates, which do not have a materially disproportionate effect (relative to other industry participants) on Company and its subsidiaries taken as a whole; (iii) the entering into or the public announcement or disclosure of this Agreement or the transactions contemplated hereby by reason of the disclosure of the identity of Parent, or the performance of this Agreement or the transactions contemplated hereby; (iv) any actions taken

29

by Company or any of the Principal Stockholders after the date hereof with the written consent of Parent pursuant to Section 5.1; (v) any changes in applicable Legal Requirements or accounting regulation or principle effected after the date hereof; (vi) failure by Company or any of its subsidiaries to meet any projections, estimates or budgets for any period prior to, on or after the date of this Agreement (provided that the underlying causes of such failure shall be considered, subject to the other exceptions set forth in this definition, in determining whether there has been, or would reasonably be expected to be, a Company Material Adverse Effect), or (vii) any acts of God, national or international hostilities, war (whether or not declared) or terrorism, which do not have a materially disproportionate effect (relative to other participants operating in industries in which Company operates) on Company and its subsidiaries taken as a whole; or (y) any event, effect, change, development, circumstance, condition or occurrence that would reasonably be expected to prevent, materially delay or materially impair the ability of Company to consummate the transactions contemplated hereby.

Section 3.2    Capital Structure.

(a)    As of the date of this Agreement, the authorized capital stock of Company consists of 192,500,000 shares of stock consisting of (i) 180,000,000 shares of Company Common Stock, of which 15,700,520 shares are issued and outstanding and of which no shares are held in Company's treasury, and (ii) 12,500,000 shares of preferred stock, par value $0.001 per share, all of which have been designated "Series A Convertible Preferred Stock," 12,500,000 of which are issued and outstanding. As of the date of this Agreement, (i) 12,687,500 shares of Company Common Stock are subject to issuance pursuant to the exercise of Company Options and (ii) 15,625,000 shares of Company Common Stock are issued as Company Restricted Shares. Except as set forth above, there are outstanding (i) no shares of capital stock or other voting securities of Company, (ii) no stock appreciation rights, phantom stock units, restricted stock grants, contingent stock grants or Employee Plans which grant awards of any of the foregoing, and no other outstanding contractual rights to which Company is a party the value of which is based on the value of Company Common Stock, (iii) no bonds, debentures, notes or other indebtedness of Company or any subsidiary having the right to vote (or convertible into, or exchangeable for, securities having the right to vote) on any matters on which stockholders of Company may vote, (iv) no securities of Company or its subsidiaries convertible into or exchangeable for shares of capital stock or voting securities of Company, (v) no options or other rights to acquire from Company or its subsidiaries and, no obligations of Company or its subsidiaries to issue any capital stock, voting securities or securities convertible into or exchangeable for capital stock or voting securities of Company and (iv) no equity equivalent interests in the ownership or earnings of Company or its subsidiaries (collectively, "Company Securities"). Section 3.2(a) of the Company Disclosure Schedule is a true, complete and correct list of all of the securityholders of Company, including, without limitation, all holders of Company Stock or other Company Securities (including Company Options) held by each securityholder of Company as of the date of this Agreement and indicating, with respect to each Company Option then outstanding, the exercise price, the number of shares of Company Common Stock into which each such Company Option is exercisable, and the expiration date of such Company Option, including the extent to which any vesting had occurred as of the date of this Agreement and the extent to which the vesting of such Company Option will be accelerated automatically by the consummation of the transactions contemplated by this Agreement or by the termination of employment or engagement or change in position of any holder thereof following

30

GSDOCS\1945236.5

or in connection with the consummation of the Merger by reason of the terms of any agreement between Company and any Person. There are no outstanding obligations of Company or its subsidiaries to repurchase, redeem or otherwise acquire any Company Securities, except as set forth in the Company Certificate of Incorporation. There are no stockholder agreements, voting trusts or other agreements or understandings to which Company is a party or by which it is bound relating to the voting or registration of any shares of capital stock of Company. To the Knowledge of Company or any of its subsidiaries, there are no irrevocable proxies and no voting agreements with respect to any shares of capital stock or the other voting securities of Company. There are no agreements requiring Company to contribute to the capital of, or lend or advance funds to, any subsidiaries of Company. There are no accrued and unpaid dividends with respect to any outstanding shares of Company Stock. The information set forth in Sections 2.2(a)(iii), 2.4(e) and 3.2(a) of the Company Disclosure Schedule, including the portion of the Total Merger Cash Consideration to be delivered to each Company Securityholder and the Escrow Agent for the account of each Company Securityholder, is true, complete and accurate as of the date hereof, and the information in such Sections of the Company Disclosure Schedule updated by Company pursuant to the terms of this Agreement will be true, complete and accurate as of immediately prior to the Effective Time, and the calculations performed to compute such information will be, as of immediately prior to the Effective Time, accurate and in accordance with the terms of this Agreement, the Company Certificate of Incorporation and Company's bylaws and all other agreements and instruments among Company and the Company Securityholders, in each case as in effect as of immediately prior to the Effective Time, after giving effect to any and all amendments or modifications thereof or waivers thereunder effected in connection with the transactions contemplated hereby. Other than in connection with any conversion of shares of Company Stock, Company Options or Company Restricted Shares pursuant to Article II, no Person has any agreement with Company to acquire any Merger Consideration. Except as set forth in Section 3.2(a) of the Company Disclosure Schedule, with respect to each Company Stockholder: (i) such Stockholder is the record holder of the shares of the Company Stock set forth in Section 2.2(a)(iii) of the Company Disclosure Schedule next to such Company Stockholder's name and, to the Knowledge of Company or any of its subsidiaries, has good and valid title to such shares of Company Stock, free and clear of any Liens; (ii) such shares of Company Stock are the only shares of the capital stock of the Company held of record by such Company Stockholder; (iii) to the Knowledge of Company or any of its subsidiaries, such Company Stockholder has the ability to vote all of such Company Stockholder's shares of Company Stock at any meeting of the stockholders of the Company, or by written consent in lieu of any such meeting; and (iv) to the Knowledge of Company or any of its subsidiaries, such Company Stockholder has not appointed or granted any proxy or entered into any agreement, contract, commitment or understanding with respect to any of such Company Stockholder's shares of Company Stock. All of the issued and outstanding shares of capital stock of Company have been duly authorized and validly issued, and are fully paid and nonassessable with no liability attaching to the ownership thereof. There exists no right of first refusal or other preemptive right with respect to any of the capital stock or other securities of any of Company or its subsidiaries or any business or assets of any of Company or its subsidiaries.

(b)    All of the outstanding capital stock of Company's subsidiaries is owned by Company, or one of its subsidiaries, directly or indirectly, free and clear of any Lien or any other material limitation or restriction (including any restriction on the right to vote or sell the same except as may be provided as a matter of any Legal Requirement). There are no securities

31

of Company or its subsidiaries convertible into or exchangeable for, no options or other rights to acquire from Company or its subsidiaries and no other contract, understanding, arrangement or obligation (whether or not contingent) providing for, the issuance or sale, directly or indirectly, by Company or any of its subsidiaries of any capital stock or other ownership interests in or any other securities of any subsidiary of Company. There are no outstanding contractual obligations of Company or its subsidiaries to repurchase, redeem or otherwise acquire any outstanding shares of capital stock or other ownership interests in any subsidiary of Company. All of the issued and outstanding shares of capital stock of each of Company's subsidiaries have been duly authorized and validly issued, and are fully paid and nonassessable, with no liability attaching to the ownership thereof. For purposes of this Agreement, "Lien" means any mortgage, lien, pledge, conditional sale agreement, default of title, easement, encroachment, encumbrance, hypothecation, reservation, restriction, security interest, title retention or other security arrangement, or any adverse right or interest, charge or claim of any nature whatsoever of, on, or with respect to, any asset, property or property interest; provided, however, that the term "Lien" shall not include (i) statutory liens for Taxes to the extent that the payment thereof is (A) not in arrears or otherwise due or (B) contested in appropriate proceedings and for which adequate reserves have been recorded on the Financial Statements, (ii) encumbrances in the nature of zoning restrictions, easements, rights or restrictions of record on the use of real property if the same do not materially impair the continued use of such property in Company's business in the manner in which it is currently used, (iii) liens to secure landlords, lessors or renters under leases or rental agreements, (iv) deposits or pledges made in connection with or to secure payment of, worker's compensation, unemployment insurance or old age pension programs in favor of carriers, warehousemen, mechanics and materialmen, liens to secure claims for labor, materials, or supplies and other similar liens incurred in the ordinary course of business consistent with past practice, or (vi) restrictions on transfer of securities imposed by applicable state and federal securities laws.

(c)    All Company Stock, Company Options, all capital stock of Company's subsidiaries and any other Company Securities outstanding have been offered, issued, and sold by Company in compliance with applicable federal and state securities laws.

(d)    To the Knowledge of Company or any of its subsidiaries, no stockholder of Company has granted options or other rights to purchase any Company Stock, Company Options or any other Company Securities from such stockholder.

Section 3.3    Authority Relative to this Agreement; Board Recommendation.

(a)    Company Authority. Company has all requisite corporate power and authority to execute and deliver this Agreement, and, subject to approval of the holders of Company Stock, to consummate the transactions contemplated hereby, including the Merger. The execution and delivery by Company of this Agreement and the performance of Company's obligations hereunder have been duly and validly authorized by all necessary corporate action on the part of Company, subject only to approval of the Merger and this Agreement by the holders of Company Stock. This Agreement has been duly executed and delivered by Company and, assuming this Agreement has been duly authorized, executed and delivered by Parent and Acquisition Sub, constitutes a valid and binding obligation of Company enforceable in accordance with its terms.

32

GSDOCS\1945236.5

(b)    Board Recommendation.  Company's board of directors has unanimously (i) determined that this Agreement and the transactions contemplated hereby, including the Merger, are advisable and in the best interests of Company and its stockholders, (ii) approved and adopted this Agreement and the transactions contemplated hereby, including the Merger, and (iii) subject to the other terms and conditions of this Agreement, resolved to recommend the Merger and approval and adoption of this Agreement and each of the transactions contemplated hereby to the holders of Company Stock, and none of such actions by Company's board of directors has been amended, rescinded, or modified.

Section 3.4    Consents and Approvals; No Violations.  The execution and delivery of this Agreement does not, and the consummation of the transactions contemplated hereby by Company will not, (a) conflict with or result in any violation of, or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, modification, suspension, cancellation, or acceleration of any obligation or to loss of a material benefit under, or the creation of a Lien on assets under ("Violate") any provision of the certificate of incorporation or bylaws of Company or the comparable governing instruments of any subsidiary of Company or (b) materially Violate any material loan or credit agreement, note, bond, mortgage, indenture, contract, lease, or other written or oral material agreement or instrument, permit, concession, franchise, license or material Legal Requirement applicable to Company, any of its subsidiaries, or any properties or assets of Company or any of its subsidiaries.  No consent, approval, order, or authorization of, or registration, declaration, or filing with or exemption by (each a "Government Consent") any court, administrative agency, or commission or other governmental authority or instrumentality, whether domestic or foreign (each a "Governmental Entity") is required by or with respect to Company in connection with the execution and delivery of this Agreement or the consummation by Company of the transactions contemplated by this Agreement, except for (x) the filing of a premerger notification report and all other required documents by Parent and Company, and the expiration or termination of all applicable waiting periods, under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), and any similar required foreign antitrust filings (if applicable) and (y) the filing of the Certificate of Merger in accordance with the DGCL.

Section 3.5    Financial Statements.

(a)    The following financial statements (collectively, the "Financial Statements") that have been provided to Parent:  (i) the audited consolidated balance sheets of Company as of January 31, 2009 and February 2, 2008 and the related consolidated statements of operations, stockholders' equity and cash flows for the fiscal year ended January 31, 2009 and for the fiscal period from October 31, 2007 to February 2, 2008, including the notes thereto, (ii) the audited consolidated balance sheets of SmartBargains, Inc. as of December 11, 2007 and the related consolidated statements of operations, stockholders' equity and cash flows for the fiscal period from February 4, 2007 to December 11, 2007, including the notes thereto (the financial statements referred to in (i) and (ii) hereof being collectively referred to as "Company's Audited Financial Statements"), and (iii) the unaudited consolidated balance sheet of Company as of August 1, 2009 (the "Balance Sheet") and related statements of income, stockholders' equity and cash flows for the fiscal year-to-date period then ended, in the case of clauses (i) and (ii) have been prepared in accordance with United States generally accepted accounting principles ("GAAP"), consistently applied throughout the periods presented without modification of the

33

accounting principles used in the preparation thereof throughout the periods presented and, in the case of clause (iii) have been relied upon by management and prepared consistent with past practice of Company. The Financial Statements are complete and correct, are in accordance with the books and records of Company and present fairly, in all material respects, the financial consolidated condition and results of operations of Company and its subsidiaries as of the dates and for the periods indicated.

(b)   To the Knowledge of Company or any of its subsidiaries, Company has in place systems and processes (including the maintenance of proper books and records) that are customary for a company at the same stage of development as Company designed to (i) provide reasonable assurances regarding the reliability of the Financial Statements and (ii) in a timely manner accumulate and communicate to Company's principal executive officer and principal financial officer the type of information that would be required to be disclosed in the Financial Statements (such systems and processes are herein referred to as the "Controls"). None of Company, its employees with accounting or finance responsibilities or who are among the persons included in the definition of "Knowledge", nor, to the Knowledge of Company or any of its subsidiaries, Company's independent auditors has identified or been made aware of any complaint, allegation, deficiency, assertion or claim, whether written or oral, regarding the Controls or the Financial Statements. To the Knowledge of Company or any of its subsidiaries, there have been no instances of fraud, whether or not material, that occurred during any period covered by the Financial Statements. Company has in place a revenue recognition policy consistent with GAAP.

Section 3.6   Absence of Changes. Except as set forth in Section 3.6 to the Company Disclosure Schedule, (i) since January 31, 2009, there have been no events, changes or effects with respect to Company or its subsidiaries that has had or would reasonably be expected to have, either individually or in the aggregate, a Company Material Adverse Effect and (ii) since August 1, 2009, there have been no events, changes or effects with respect to Company or its subsidiaries that would not have been permitted without the consent of Parent under Section 5.1 had they occurred after the execution of this Agreement, except where the same has been approved in writing by Parent under Section 5.1; provided, however, that, for purposes of clause (ii) of this Section 3.6, conditions set forth in any subsection of Section 5.1(b) providing for "consultation with Parent" shall be disregarded.

Section 3.7   Absence of Undisclosed Liabilities. Company and its subsidiaries do not have any Indebtedness or other liabilities or obligations (whether known, unknown, mature, unmature, absolute or contingent) which are of a nature required by GAAP to be reflected in a balance sheet or the notes thereto or are of a nature not required by GAAP to be reflected in a balance sheet because the amount of loss with respect to such contingent liability cannot be reasonably estimated, except for (a) liabilities and obligations shown on the Balance Sheet, and (b) liabilities and obligations which have arisen since the date of the Balance Sheet in the ordinary course of business and which are, in nature and amount, consistent with those incurred historically and have not had, and would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect. For purposes of this Agreement, "Indebtedness" shall include all liabilities and obligations, including any applicable penalties (including with respect to any prepayment thereof), interest and premiums, (i) for borrowed money, (ii) evidenced by notes, bonds, debentures or similar instruments, (iii) for the deferred

34

GSDOCS\1945236.5

purchase price of goods or services (other than trade payables incurred in the ordinary course of business), (iv) under capital leases, (v) with respect to letters of credit, (vi) in the nature of guarantees of the obligations described in clauses (i) through (v) above of any other Person, or (vii) in the nature of obligations of the type referred to in clauses (i) through (vi) of any other Person secured by any Lien on any asset of Company or any of its subsidiaries.

Section 3.8    No Default.  None of Company or its subsidiaries is in breach, default or violation (and no event has occurred which with notice or the lapse of time or both would constitute a breach, default or violation) of any term, condition or provision of (a) its certificate of incorporation or bylaws (or similar governing documents), (b) any Contract or Company Permit or (c) any Legal Requirement applicable to Company or any of its subsidiaries or any of their respective properties or assets except, in the case of (b) or (c), for violations, breaches or defaults that have not had and would not reasonably be expected to have, either individually or in the aggregate, a Company Material Adverse Effect.

Section 3.9    Litigation.  There is no suit, claim, action, proceeding or investigation pending or, to the Knowledge of Company or any of its subsidiaries, threatened against Company or any of its subsidiaries or any of their respective properties or assets before any Governmental Entity or arbitrator which would be reasonably expected to result in material costs, losses, fines, penalties, settlements, awards, royalties, lost business opportunities, front pay or back pay orders, equitable relief, remediation or other damages to Company or its subsidiaries, if determined adversely, result in an injunction preventing Company or any of its subsidiaries from offering any current or presently contemplated products or services, or affect the validity, enforceability or ability to use or own any Company Intellectual Property or would reasonably be expected to prevent or significantly delay the consummation of the transactions contemplated by this Agreement.  None of Company or its subsidiaries is subject to any outstanding order, writ, injunction or decree of any Governmental Entity that has had or would reasonably be expected to have, either individually or in the aggregate, a Company Material Adverse Effect.

Section 3.10    Compliance with Applicable Law.

(a)    Company and its subsidiaries hold all material permits, licenses, variances, exemptions, orders and approvals from all Governmental Entities necessary for the lawful conduct of their respective businesses as presently conducted (the "Company Permits") all of which are valid and in full force and effect in all material respects, subject to any conditions imposed by any such authority, and no notice of revocation has been received or is pending or, to the Knowledge of Company or any of its subsidiaries, threatened, in respect thereof, and, to the Knowledge of Company or any of its subsidiaries, no event has occurred which permits, or upon the giving of notice or passage of time or both would permit, revocation, non-renewal, modification, suspension, limitation or termination of any Company Permit that currently is in effect.  Neither Company nor any of its subsidiaries has any Knowledge that any Governmental Entity is considering limiting, suspending, revoking or refusing to grant or renew any Company Permit.  Company and its subsidiaries are in compliance with the terms of the Company Permits except where the failure so to comply has not had and would not reasonably be expected to have, either individually or in the aggregate, a Company Material Adverse Effect.

35

(b)    The businesses of Company and its subsidiaries are not being conducted in violation of any Legal Requirement, except that no representation or warranty is made in this Section 3.10 with respect to Environmental Laws and except for violations or possible violations which have not had and would not reasonably be expected to have, either individually or in the aggregate, a Company Material Adverse Effect.  Neither Company nor any of its subsidiaries has any Knowledge that any Governmental Entity is investigating Company or any of its subsidiaries other than ordinary course background checks and administrative reviews or an ordinary course review of the transactions contemplated hereby.  To the Knowledge of Company or any of its subsidiaries, no investigation or review by any Governmental Entity with respect to Company or its subsidiaries is pending or threatened, in any case other than such investigations or reviews as have not had and would not reasonably be expected to have, either individually or in the aggregate, a Company Material Adverse Effect.

Section 3.11    Personnel.

(a)    Section 3.11(a) of the Company Disclosure Schedule sets forth a list of all employees, consultants or independent contractors of Company or any of its subsidiaries as of the date hereof, including, as of such date, their title, then current base salary or other compensation rate as well as any bonus paid or payable for the fiscal year ended January 31, 2009 or any accrued and unpaid bonus scheduled for or paid or agreed to be paid for any future period and any Fair Labor Standards Act status.

(b)    Company and its subsidiaries are in compliance in all material respects with Legal Requirements relating to the employment of labor, including all such Legal Requirements relating to wages, hours, WARN and any similar state or local "mass layoff" or "plant closing" Legal Requirement, collective bargaining, discrimination, civil rights, safety and health, workers' compensation and the collection and payment of withholding and/or social security taxes and any similar tax.  There has been no "mass layoff" or "plant closing" (as defined by WARN) with respect to Company or its subsidiaries within the six (6) months prior to Closing.  "WARN" means the Worker Adjustment and Retraining Notification Act of 1988, as amended.

(c)    Neither Company nor any of its subsidiaries is subject to any collective bargaining agreement or other labor union contract, and no employee of Company or any subsidiary of Company is represented by a labor union.  There is not pending or, to the Knowledge of Company or any of its subsidiaries, threatened, any picketing, strike, labor dispute, slowdown, lockout, walkout, work stoppage or other similar labor trouble involving employees of Company or any of its subsidiaries, and no union organizing activities are taking place or have taken place with respect to such employees.  To the Knowledge of Company or any of its subsidiaries, there are no material activities or proceedings of any labor union or organization or employee representative to organize any employees of Company or its subsidiaries.

(d)    To the Knowledge of Company or any of its subsidiaries, none of Company's or any of its subsidiaries' officers or key employees or key independent contractors intend to terminate his or her relationship with Company or its subsidiaries for any reason, including, without limitation, as a result of the transactions contemplated hereby.

36

GSDOCS\1945236.5

Section 3.12    Employee Benefit Plans; Labor Matters.

(a)    Section 3.12(a) of the Company Disclosure Schedule contains a true and complete list of each material deferred compensation and each incentive compensation, stock purchase, stock option and other equity compensation plan, program, agreement or arrangement; each severance or termination pay, medical, surgical, hospitalization, life insurance and other "welfare" plan, fund or program (within the meaning of section 3(1) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")); each profit-sharing, stock bonus or other "pension" plan, fund or program (within the meaning of section 3(2) of ERISA); each material employment, termination or severance agreement; and each other material employee benefit plan, fund, program, agreement or arrangement, in each case, that is sponsored, maintained or contributed to or required to be contributed to by Company or by any trade or business, whether or not incorporated (an "ERISA Affiliate"), that together with Company would be deemed a "single employer" within the meaning of Section 414 of the Code, or to which Company or an ERISA Affiliate is party, whether written or oral, for the benefit of any employee or former employee of Company or any subsidiary (the "Employee Plans"). Except with respect to the Incentive Bonus Plan to be adopted by the Surviving Corporation effective as of the Effective Time, neither Company, any subsidiary nor any ERISA Affiliate has any legally binding commitment or formal plan to create any additional employee benefit plan which, if created, would constitute an Employee Plan, or to modify or change any existing Employee Plan that would affect any employee or former employee of Company or any subsidiary.

(b)    With respect to each Employee Plan, Company has heretofore delivered or made available to Parent (i) true and complete copies of the Employee Plan and any amendments thereto (or if the Employee Plan is not a written Employee Plan, a summary of the material terms thereof); (ii) any related trust or other funding vehicle; (iii) any reports or summaries required under ERISA or the Code; (iv) the most recent determination letter issued by the Internal Revenue Service (the "IRS"), or if none, IRS opinion or advisory letter issued with respect to each Employee Plan intended to qualify under section 401 of the Code; (v) copies of all material correspondence (including all closing letters, audit finding letters, revenue agent findings and similar documents) to or from any governmental agency relating to any Employee Plan (including the Department of Labor and the IRS); (vi) the results of all discrimination testing performed with respect to each Employee Plan for the most recent three (3) years; (vii) stop loss insurance policies; and (viii) all administrative service agreements, group annuity contracts, group insurance contracts and similar written agreements and contracts relating to each Employee Plan.

(c)    None of the Employee Plans is a "multiemployer plan," as such term is defined in Section 3(37) of ERISA, and no Employee Plan is subject to 302, 303, 304 or Title IV of ERISA or Sections 412, 430, 431 or 432 of the Code. No liability under Title IV or sections 302, 303 or 304 of ERISA has been incurred by Company or any ERISA Affiliate that has not been satisfied in full, and no condition exists that presents a material risk to Company or any ERISA Affiliate of incurring any such liability, other than liability for premiums due the Pension Benefit Guaranty Corporation ("PBGC") (which premiums have been paid when due).

(d)    Neither Company nor any subsidiary, any Employee Plan, any trust created thereunder, nor any trustee or administrator thereof has engaged in a transaction in

37

connection with which Company or any subsidiary, any Employee Plan, any such trust, or any trustee or administrator thereof, or any party dealing with any Employee Plan or any such trust could be subject to either a civil penalty assessed pursuant to section 409 or 502(i) of ERISA or a tax imposed pursuant to section 4975 or 4976 of the Code, in any case which would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

(e)    Each Employee Plan has been operated and administered in all material respects in accordance with its terms and applicable Legal Requirements, including but not limited to ERISA, the Code and the Massachusetts Health Reform Act. There is no pending, threatened or, to the Knowledge of Company, anticipated action, suit, claim, audit, inquiry or proceeding relating or with respect to the Employee Plans by any employee, participant, IRS or Department of Labor.

(f)    Each Employee Plan intended to be "qualified" within the meaning of section 401(a) of the Code is subject to a currently effective favorable determination, notification, advisory or opinion letter, as applicable, as to its qualification status from the IRS or still has a remaining period of time under applicable Treasury Regulations.

(g)    Each Employee Plan that is a "nonqualified deferred compensation plan" (as defined in Code section 409A(d)(1)) is in compliance with Code section 409A and the rules and regulations issued thereunder as to both form and operation, except where the failure so to comply has not had and would not reasonably be expected to have, either individually or in the aggregate, a Company Material Adverse Effect. Company is not a party to, and is not otherwise obligated under, any contract, plan or arrangement that provides for the gross-up of the Tax imposed by section 409A(a)(1)(B) of the Code. To the Knowledge of the Company or any of its subsidiaries, no stock or equity unit option granted under any Employee Plan has an exercise price that has been or may be less than the fair market value of the underlying stock or equity units (as the case may be) as of the date such option was granted or has any feature for the deferral of compensation that could render the grant subject to Section 409A of the Code. The earn-out allocation determined by the Company and set forth on the Earn-Out Allocation Schedule either complies with or is exempt from Section 409A of the Code. The Incentive Bonus Plan either complies with or is exempt from Section 409A of the Code. Any discretion granted to the Incentive Bonus Plan Administrator will be limited in all respects by Section 409A of the Code, if applicable, and none of the actions that the Administrator may properly take under the Incentive Bonus Plan could result in the Incentive Bonus Plan's not complying with or being exempt from Section 409A of the Code.

(h)    No Employee Plan provides medical, surgical, hospitalization, death or similar benefits (whether or not insured) for employees or former employees of Company or any subsidiary for periods extending beyond their retirement or other termination of service, other than (i) coverage mandated by applicable law, (ii) death benefits under any "pension plan," or (iii) benefits the full cost of which is borne by the current or former employee (or his beneficiary).

(i)    Company has disclosed all "parachute payments" and "excess parachute payments" as defined by section 280G of the Code and the regulations and guidance issued with respect to section 280G of the Code in Section 3.12(i) of the Company Disclosure Schedule. No

38

amounts payable by the Company or its affiliate will fail to be deductible for federal income tax purposes by virtue of section 280G of the Code.

(j)    Neither the negotiation and execution of this Agreement nor the consummation of the transactions contemplated by this Agreement will, either alone or in combination with another event, (i) entitle any current or former employee or officer of Company or any ERISA Affiliate to severance pay, unemployment compensation or any other payment, except as provided under any applicable unemployment compensation Legal Requirement and except as set forth in Section 3.12(j)(1) of the Company Disclosure Schedule, or (ii) accelerate the time of payment or vesting, or increase the amount of compensation due any such employee or officer, except as set forth in Section 3.12(j)(2) of the Company Disclosure Schedule.

(k)    There are no pending or, to the Knowledge of Company or any of its subsidiaries, threatened or anticipated claims by or on behalf of any Employee Plan, by any employee or beneficiary covered under any such Employee Plan, or otherwise involving any such Employee Plan (other than routine claims for benefits).

(l)    There are no material controversies pending or, to the Knowledge of Company or any of its subsidiaries, threatened between Company or any of its subsidiaries and any of their respective employees.

(m)    Except as provided for in this Agreement, neither Company nor any of its subsidiaries is a party to any oral or written (i) employment or consulting agreements not terminable on thirty (30) days' or less notice, (ii) agreement with any executive officer or other key employee of Company or any of its subsidiaries the benefits of which are contingent or vest, or the terms of which are materially altered, upon the occurrence of a transaction involving Company or any of its subsidiaries of the nature contemplated by this Agreement, (iii) agreement with respect to any executive officer or other key employee of Company or any of its subsidiaries providing any term of employment or compensation guarantee or (iv) agreement or plan, including any stock option, stock appreciation right, restricted stock or stock purchase plan, any of the benefits of which will be increased, or the vesting of the benefits of which will be accelerated, by the occurrence of any of the transactions contemplated hereby or the value of any of the benefits of which will be calculated on the basis of any of the transactions contemplated hereby.

Section 3.13    Environmental Laws and Regulations.

(a)    Company and each of its subsidiaries is in compliance with all applicable Environmental Laws, which compliance includes, but is not limited to, the possession by Company and its subsidiaries of all permits and other governmental authorizations required under applicable Environmental Laws, and compliance with the terms and conditions thereof, except where the failure so to comply has not had and would not reasonably be expected to have, either individually or in the aggregate, a Company Material Adverse Effect. Neither Company nor any of its subsidiaries has received any communication (written or oral), whether from a Governmental Entity, Person, group, employee or otherwise, that alleges that Company or any of its subsidiaries is not in such material compliance, and, to the Knowledge of Company or any of

39

its subsidiaries, there are no circumstances that would reasonably be likely to prevent or interfere with such material compliance in the future. All permits and other governmental authorizations currently held by Company or any of its subsidiaries pursuant to the Environmental Laws are identified in Section 3.13 of the Company Disclosure Schedule.

(b)    There is no Environmental Claim pending or, to the Knowledge of Company or any of its subsidiaries, threatened against Company or any of its subsidiaries or against any Person whose liability for any Environmental Claim Company or any of its subsidiaries has or may have retained or assumed either contractually or by operation of law.

(c)    To the Knowledge of Company or any of its subsidiaries, there are no past or present actions, activities, circumstances, conditions, events or incidents, including, without limitation, the release, emission, discharge, presence or disposal of any Material of Environmental Concern that could form the basis of any Environmental Claim against Company or any of its subsidiaries or against any Person whose liability for any Environmental Claim Company or any of its subsidiaries has or may have retained or assumed either contractually or by operation of law.

(d)    Without in any way limiting the generality of the foregoing, (i) all on-site and off-site locations where Company or any of its subsidiaries has stored, disposed or arranged for the disposal of Materials of Environmental Concern are identified in Section 3.13 of the Company Disclosure Schedule, (ii) to the Knowledge of Company or any of its subsidiaries, all underground storage tanks, and the capacity and contents of such tanks, located on property owned, operated, or leased by Company or any of its subsidiaries are identified in Section 3.13 of the Company Disclosure Schedule, (iii) to the Knowledge of Company or any of its subsidiaries, there is no asbestos contained in or forming part of any building, building component, structure or office space owned or leased by Company or any of its subsidiaries, (iv) to the Knowledge of Company or any of its subsidiaries, no polychlorinated biphenyls ("PCBs") are used or stored at any property owned or leased by Company or any of its subsidiaries, (v) to the Knowledge of Company or any of its subsidiaries, all underground storage tanks owned, operated, or leased by Company or any of its subsidiaries and which are subject to regulation under the federal Resource Conservation and Recovery Act (or equivalent state or local law regulating underground storage tanks) meet the technical standards prescribed at Title 40 Code of Federal Regulations Part 280 which became effective December 22, 1998 (or any applicable state or local law requirements which are more stringent than such technical standards or which became effective before such date), and (vi) all properties formerly owned or operated by Company, or any subsidiary, affiliate (excluding any Company Stockholder), or predecessor thereof are identified in Section 3.13 of the Company Disclosure Schedule, and there are no violations of Environmental Laws associated with such properties (other than such violations that have not had and would not reasonably be expected to have, either individually or in the aggregate, a Company Material Adverse Effect) nor are there any Environmental Claims related to any of Company's or its subsidiaries' actions or omissions with respect to such properties that are pending or, to the Knowledge of Company or any of its subsidiaries, threatened against Company or any of its subsidiaries or against any Person whose liability for any Environmental Claim Company or any of its subsidiaries has or may have retained or assumed either contractually or by operation of law.

40

GSDOCS\1945236.5

For purposes of this Agreement, the following terms shall have the following meanings:

"Environmental Claim" means any claim, action, cause of action, investigation or notice (written or oral) by any person or entity alleging potential liability (including, without limitation, potential liability for investigatory costs, cleanup costs, governmental response costs, natural resources damages, property damages, personal injuries, or penalties) arising out of, based on or resulting from (a) the presence, or release into the environment, of any Material of Environmental Concern at any location, whether or not owned or operated by Company or any of its subsidiaries or (b) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law.

"Environmental Laws" means all Legal Requirements and laws, including common laws relating to pollution or protection of human health, safety, or the environment (including, without limitation, ambient air, surface water, ground water, land surface or subsurface strata), including, without limitation, laws and regulations relating to emissions, discharges, releases or threatened releases of Materials of Environmental Concern, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Materials of Environmental Concern.

"Materials of Environmental Concern" means chemicals, pollutants, contaminants, wastes, toxic substances, hazardous substances, radioactive materials, asbestos, petroleum and petroleum products as well as Hazardous Substances as that term is defined under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601 et seq., as amended.

Section 3.14    Taxes.

(a)    For purposes of this Agreement:

(i)    "Tax" or "Taxes" means any and all taxes, including any interest, penalties, or other additions to tax that may become payable in respect thereof, imposed by any Taxing Authority, which taxes shall include, without limiting the generality of the foregoing, all income taxes, profits taxes, taxes on gains, alternative minimum taxes, estimated taxes, payroll taxes, employee withholding taxes, unemployment insurance taxes, social security taxes, welfare taxes, disability taxes, severance taxes, license charges, taxes on stock, sales taxes, use taxes, ad valorem taxes, value added taxes, excise taxes, franchise taxes, gross receipts taxes, business license taxes, occupation taxes, real or personal property taxes, stamp taxes, environmental taxes, transfer taxes, workers' compensation taxes, windfall taxes, net worth taxes, unclaimed property taxes, escheat taxes and other taxes, fees, duties, levies, customs, tariffs, imposts, assessments, obligations and charges of the same or of a similar nature to any of the foregoing;

(ii)    "Tax Return" means any and all returns, reports, information returns, declarations, statements, certificates, bills, schedules, documents, claims for refund, or other written information of or with respect to any Tax which is supplied to or required to be supplied to any Taxing Authority, including any and all attachments, amendments and supplements thereto;

41

(iii)    "Taxing Authority" means any and all federal, state, local and non-U.S. governments, agencies, and political subdivisions of any such government having jurisdiction over the assessment, determination, collection, imposition or administration of any Tax; and

(iv)    "Treasury Regulations" means the regulations promulgated under the Code.

(b)    All Tax Returns required to be filed by or with respect to Company or any of its subsidiaries have been or will be timely filed and are or will be true, correct, and complete in all material respects. Each of Company and its subsidiaries have paid all Taxes required to be paid by it (whether or not shown on a Tax Return), except to the extent that adequate reserve therefor has been made on the Balance Sheet.

(c)    No Person has extended or waived the application of any statute of limitations of any jurisdiction regarding the assessment or collection of any Tax of or with respect to Company or any of its subsidiaries and no power of attorney has been granted by or with respect to Company or any of its subsidiaries with regard to any matters relating to Taxes.

(d)    No Taxes of or with respect to Company or any of its subsidiaries are being contested as of the date hereof and there are no audits, claims, assessments, levies, administrative or judicial proceedings pending, threatened, proposed (tentatively or definitely) or contemplated against, or regarding Taxes of or with respect to, Company or any of its subsidiaries.

(e)    Neither Company nor any of its subsidiaries conducts any business in or derives income from any state, local or non-U.S. jurisdiction other than those jurisdictions for which Tax Returns have been timely filed by or with respect to Company or its subsidiaries. No claim has ever been made by a Taxing Authority in a jurisdiction where a Tax Return is not filed by Company or any of its subsidiaries that Company or any of its subsidiaries is subject to Tax in that jurisdiction. Section 3.14(e) of the Company Disclosure Schedule lists all jurisdictions in which Tax Returns are required to be filed, or Taxes required to be paid, by or with respect to Company or any of its subsidiaries.

(f)    There are no liens for Taxes on any assets of Company or any of its subsidiaries except for Taxes not yet due and payable.

(g)    Company and each of its subsidiaries has complied with the provisions of the Code relating to the withholding and payment of Taxes, including, without limitation, the withholding and reporting requirements under Code sections 1441 through 1464, 3401 through 3406, and 6041 through 6049, as well as similar Legal Requirements, and has, within the time and in the manner prescribed by the applicable Legal Requirements, withheld from employee wages and paid over to the proper Taxing Authorities all amounts required. Company and each of its subsidiaries has undertaken in good faith to appropriately classify all service providers as either employees or independent contractors for all Tax purposes. Except as set forth on Section 3.14(g) of the Company Disclosure Schedule, Company and each of its subsidiaries (i) has

42

GSDOCS\1945236.5

collected and remitted all applicable sales and/or use Taxes to the appropriate Taxing Authority, or (ii) has obtained, in good faith, any applicable sales and/or use Tax exemption certificates.

(h)    Since January 31, 2009, no Person has (i) changed any financial or Tax accounting methods, policies or practices of or with respect to Company or any of its subsidiaries except as required by a change in GAAP, (ii) made, revoked, or amended any Tax election of or with respect to Company or any of its subsidiaries, (iii) filed any amended Tax Return or claim for refund of or with respect to Company or any of its subsidiaries, or (iv) settled or compromised any Tax liability or refund of or with respect to Company or any of its subsidiaries.

(i)    Except for the affiliated group of which Company is presently a member, the Company has never been a member of an affiliated group of corporations, within the meaning of Section 1504 of the Code, other than as a common parent corporation, and each of Company's subsidiaries has never been a member of an affiliated group of corporations, within the meaning of Section 1504 of the Code, except where Company was the common parent of such affiliated group.

(j)    Neither Company nor any of its subsidiaries is obligated by any contract, agreement or other arrangement to indemnify any other person with respect to Taxes. Neither Company nor any of its subsidiaries is now or has ever been a party to or bound by any contract, agreement or other arrangement (whether or not written) that (i) requires Company or any of its subsidiaries to make any Tax payment to or for the account of any other Person, (ii) affords any other person the benefit of any net operating loss, net capital loss, investment Tax credit, foreign Tax credit, charitable deduction or any other credit or Tax attribute which could reduce Taxes (including, without limitation, deductions and credits related to alternative minimum Taxes) of Company or any of its subsidiaries, or (iii) requires or permits the transfer or assignment of income, revenues, receipts or gains to Company or any of its subsidiaries from any other Person.

(k)    The Company and each of its subsidiaries (i) has disclosed to the IRS on the appropriate Tax Returns any Reportable Transaction in which it has participated and (ii) has retained all documents and other records pertaining to any Reportable Transaction in which it has participated, including documents and other records listed in Treasury Regulation Section 1.6011-4(g) and any other documents or other records which are related to any Reportable Transaction in which it has participated but not listed in Treasury Regulation Section 1.6011-4(g). For purposes of this Agreement, the term "Reportable Transaction" shall mean any transaction listed in Treasury Regulation Section 1.6011-4(b).

(l)    Neither Company nor any of its subsidiaries shall be required to include in a Tax period ending after the Closing Date taxable income attributable to income that accrued in a prior Tax period but was not recognized in any prior Tax period. Neither Company nor any of its subsidiaries has agreed to make, nor is it required to make, any adjustment under Section 481(a) of the Code (or any similar state, local or foreign Legal Requirement) by reason of a change in accounting method or otherwise, and, the IRS or other applicable Taxing Authority has not proposed any such adjustment or change in accounting method.

43

(m)     No Tax liability has been incurred by or with respect to Company or any of its subsidiaries since January 31, 2009, except for Taxes incurred in the ordinary course of business.

(n)     The Tax Returns of or with respect to Company and each of its subsidiaries for all taxable years and periods ending prior to January 31, 2006 (i) have been examined and the taxable years or periods closed by the relevant Taxing Authority, and no adjustments to such Tax Returns were made, or (ii) have not been examined but the statute of limitations with respect to all such Tax Returns have expired.

(o)     Company and each of its subsidiaries has made available to Parent and Acquisition Sub true and complete copies of all Tax Returns for each of the taxable years and periods ending on or after January 31, 2006.

(p)     All written communications to or from any Taxing Authority have been made available to Parent and Acquisition Sub for inspection.  No written ruling has been received from any Taxing Authority by or with respect to Company or any of its subsidiaries. No closing agreement pursuant to Section 7121 of the Code (or any similar provision of state, local or non-U.S. law) has been entered into by or with respect to Company or any of its subsidiaries.

(q)     Neither Company nor any of its subsidiaries is or has been a "United States real property holding corporation" within the meaning of Section 897(c)(2) of the Code.

(r)     Section 3.14(r) of the Company Disclosure Schedule sets forth the amounts of net operating loss and credit carryovers, if any, of Company and its subsidiaries, and the dates on which such carryovers expire.  The use of such net operating loss or credit carryovers is not subject to limitations imposed by Section 382 or Section 383 of the Code (or any similar provision of state, local or non-U.S. law).

(s)     Section 3.14(s) of the Company Disclosure Schedule sets forth the respective entity classifications, and the applicable dates for such classifications, of Company each of its subsidiaries for U.S. federal and state Tax purposes.

(t)     All related party transactions involving Company or any of its subsidiaries are at arm's length in compliance with Section 482 of the Code, the Treasury Regulations promulgated thereunder, and any similar provision of state, local and non-U.S. law.  Neither Company nor any of its subsidiaries is a party to any cost-sharing agreement or similar arrangement which is not a "qualified cost sharing arrangement" with the meaning of Treasury Regulations Section 1.482-7.  All intercompany payments have been calculated in accordance with Treasury Regulations Section 1.482-7.  Company and each of its subsidiaries has maintained in all respects all necessary documentation in connection with such related party transactions in accordance with Sections 482 and 6662 of the Code and the Treasury Regulations promulgated thereunder.

(u)     None of the assets of Company or any of its subsidiaries is (i) required, pursuant to Section 168(g) of the Code, to be depreciated under the "alternative depreciation system" within the meaning of Section 168(g)(2) of the Code, (ii) subject to the provisions of

44

Section 168(f) of the Code, or (iii) subject to a tax benefit transfer lease subject to the provisions of former Section 168(f)(8) of the Code.

(v)    Neither Company nor any of its subsidiaries has been the "distributing company" (within the meaning of Section 355(a)(1) of the Code) nor the "controlled corporation" (within the meaning of Section 355(a)(1) of the Code) (i) within the two-year period ending as of the date of this Agreement or (ii) in a distribution that could otherwise constitute part of a "plan" or "series of transactions" (within the meaning of Section 355(e) of the Code) in conjunction with this Agreement.

(w)    Neither Company nor any of its subsidiaries has or have ever had a permanent establishment or other taxable presence in any foreign country, as determined pursuant to applicable foreign law and any applicable Tax treaty or convention between the United States and such foreign country.

(x)    Except as disclosed on Section 3.14(x) of the Company Disclosure Schedule, neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby either solely as a result thereof or in conjunction with any other events will result in, or constitute an event which, with the passage of time or the giving of notice or both will result in the accelerated vesting of, any payment or benefit to any employee, officer, director or consultant of Company or any of its subsidiaries.  Except as disclosed on Section 3.14(x) of the Company Disclosure Schedule, no amount paid or payable by Company or any of its subsidiaries or affiliates in connection with the transactions contemplated hereby either solely as a result thereof or in conjunction with any other events will be an "excess parachute payment" within the meaning of Section 280G of the Code.  Except as disclosed on Section 3.14(x) of the Company Disclosure Schedule, there is no agreement, plan, arrangement or other contract covering any employee or independent contractor or former employee or former independent contractor of the Company or any of its subsidiaries that, considered individually or considered collectively with any other such agreement, plan, arrangement or other contract, will, or would reasonably be expected to, give rise directly or indirectly to the payment of any amount that would not be deductible pursuant to Section 280G or Section 162 of the Code, nor will Company or any of its subsidiaries be required to "gross up" or otherwise compensate or reimburse any such person because of the imposition of any excise tax.

Section 3.15    Intellectual Property.

(a)    For the purposes of this Agreement, the following terms have the meanings set forth below:

(i)    "Company Intellectual Property" means all rights (including, but not limited to, rights of ownership and rights under license from other Persons) of Company or its subsidiaries with respect to any Intellectual Property Rights, including without limitation Registered Intellectual Property Rights, that are necessary to or used in the operation of the business of Company and its subsidiaries.

(ii)    "Company Product" means any product or service offering of Company or any of its subsidiaries being marketed, sold, licensed or distributed by Company or

45

any of its subsidiaries as of the date of this Agreement or from the date of this Agreement through and including the Effective Time, excluding inventory acquired from third parties.

(iii) "Intellectual Property Rights" means any and all worldwide rights in, arising from or associated with the following, whether protected, created or arising under the laws (whether common law or statutory) of the United States or any other jurisdiction or under any international convention of whatever nature and in whatever form: (A) all patents and applications therefor and all reissues, divisions, re-examinations, renewals, extensions, provisionals, substitutions, continuations and continuations-in-part thereof, and equivalent or similar rights anywhere in the world in inventions and discoveries including, without limitation, invention disclosures (collectively, "Patents"); (B) all trade secrets and other proprietary information which derives independent economic value from not being generally known to the public (collectively, "Trade Secrets"); (C) all copyrights, copyrights registrations and applications therefor (collectively, "Copyrights"); (D) all uniform resource locators, e-mail and other internet addresses (collectively, "URLs"); (E) all trade names, brand names, corporate names, registered designs, logos, trademarks, service marks and trademark and service mark registrations and applications therefor and all goodwill associated therewith, and domain names and applications and registrations therefor (collectively, "Trademarks"); (F) all inventions, trade dress, formula, database rights, rights in Software, moral rights, performers rights, know-how, other intellectual property rights including all permits; and (G) any similar, corresponding or equivalent industrial, intellectual or commercial rights or property subsisting under the laws of each and every jurisdiction throughout the world whether registered or not, and whether vested, contingent or future, and all divisions, continuations, continuations-in-part, substitutes, reversions, renewals and extensions of any of the foregoing, and all rights under permits, laws or otherwise in relation to any of the foregoing, as well as the rights to sue for past, present, and future infringement of any and all such intellectual property rights.

(iv) "Registered Intellectual Property Rights" means all United States and foreign: (1) Patents; (2) Trademarks; (3) Copyrights; (4) URL registrations; and (5) any other Intellectual Property Right, in each case that is the subject of an application, certificate, filing, registration or other document issued by, filed with or recorded by any state, government or other public legal authority at any time.

(v) "Software" means any computer program, operating system, application, firmware or software of any nature, whether operational, active, under development or design, non-operational or inactive including all object code, source code, comment code, algorithms, processes, formulae, interfaces, navigational devices, menu structures or arrangements, icons, operational instructions, scripts, commands, syntax, screen designs, reports, designs, concepts, visual expressions, technical manuals, test scripts, user manuals and other documentation therefore, whether in machine-readable form, programming language or any other language or symbols, and whether stored, encoded, recorded or written on disk, tape, film, memory device, paper or other media of any nature and any databases necessary to operate any such computer program, operating or other system, application, firmware or software.

(b) Section 3.15(b) of the Company Disclosure Schedule lists all Company Intellectual Property consisting of Patents, Copyrights, Trademarks, and Registered Intellectual Property (except for URLs), and the Patents, Copyrights, Trademarks and Registered Intellectual

46

Property (except for URLs) so listed constitute all of the Patents, Copyrights and Trademarks that are necessary to or used in the business of Company and its subsidiaries. With respect to Registered Intellectual Property Rights owned by Company or any of its subsidiaries as of the date hereof (the "Company Registered Intellectual Property Rights"), Section 3.15(b) of the Company Disclosure Schedule also sets forth a brief description of the intangible, the record owner of such Company Registered Intellectual Property Rights, the registration or application number, and the jurisdictions in which each of the Company Registered Intellectual Property Rights has been issued or registered or in which any such application for issuance or registration has been filed. Section 3.15(b) of the Company Disclosure Schedule also lists any pending proceedings or actions before any Governmental Entity (including the United States Patent and Trademark Office or equivalent authority anywhere in the world) or arbitrator related to any Company Registered Intellectual Property Right or any other Company Intellectual Property. Section 3.15(b) of the Company Disclosure Schedule also lists Company Intellectual Property consisting of Software other than off-the-shelf Software ("Material Software").

(c) Company and its subsidiaries have no Knowledge of any facts or circumstances that would render any Company Intellectual Property invalid or unenforceable. Company or its subsidiaries has not misrepresented, or failed to disclose, any facts or circumstances in any application for any Company Registered Intellectual Property Right that would constitute fraud with respect to such application.

(d) Each Company Registered Intellectual Property Right is valid and subsisting (or, in the case of application, applied for), and to the Knowledge of Company or any of its subsidiaries, enforceable, all necessary registration, maintenance and renewal fees currently due in connection with such Company Registered Intellectual Property Rights have been paid, has not expired or been cancelled, and all necessary documents and certificates in connection with such Company Registered Intellectual Property Rights have been filed with the relevant patent, copyright, trademark or other authorities in the United States or foreign jurisdictions, as the case may be, for the purposes of maintaining such Company Registered Intellectual Property Rights. Except as set forth on Section 3.15(d) of the Company Disclosure Schedule, each item of Company Intellectual Property owned by Company was created as a work or invention for hire (as defined under U.S. copyright or patent law, as applicable) for and on behalf of Company by employees of Company, except to the extent such Intellectual Property Rights in such Company Intellectual Property have been irrevocably assigned or licensed to Company as of the Closing Date pursuant to a valid written document, a true, correct and complete copy of which document has been made available to Parent. Without limiting the foregoing, none of the Patents listed on Section 3.15(b) of the Company Disclosure Schedule is currently involved in any interference, reissue, reexamination or opposition proceeding, and, to the Knowledge of Company or any of its subsidiaries, there has been and is no claim or assertion to the contrary.

(e) All Company Intellectual Property will be fully transferable, alienable or licensable to the Surviving Corporation by Company by operation of the Merger without restriction and without payment of any kind to any third party.

(f) Each item of Company Intellectual Property owned by the Company is free and clear of any Liens, other than non-exclusive licenses.

GSDOCS\1945236.5

(g)    Company is the exclusive owner, or, to the extent not owned by Company, Company has and at all times had the valid right and necessary licenses to use, all Intellectual Property Rights that are necessary to the operation or conduct of its business.

(h)    No third party has any rights to any Company Intellectual Property owned by Company or its subsidiaries (other than non-exclusive license rights).

(i)    No Company Intellectual Property, or its past or current uses or future use as presently contemplated, has violated, misappropriated, interfered with or infringed upon, or is violating, misappropriating, interfering with or infringing upon any Intellectual Property Rights or other proprietary right of any Person, nor to the Knowledge of Company or any of its subsidiaries, has any Company Intellectual Property been violated, misappropriated, interfered with or infringed upon by any Intellectual Property Rights or other proprietary right of any Person. No proceeding is pending or is threatened, nor, to the Knowledge of Company or any of its subsidiaries, has any claim or demand been made, which: (i) claims that the operation of the business of Company or any of its subsidiaries or any act, product, technology or service of Company or any of its subsidiaries infringes or misappropriates any Intellectual Property Right of any Person or (ii) challenges or challenged the legality, validity, enforceability, use or exclusive ownership by Company or any of its subsidiaries of any or all of the Company Intellectual Property.

(j)    To the Knowledge of Company or any of its subsidiaries, no Person is infringing or misappropriating any Company Intellectual Property.

(k)    No Company Intellectual Property owned by Company or any of its subsidiaries is subject to any pending proceeding or outstanding order that restricts and/or conditions in any manner the use, transfer or licensing thereof by Company or any of its subsidiaries or which would reasonably be expected to materially adversely affect the validity, use or enforceability of such Company Intellectual Property.

(l)    With respect to Material Software, neither Company nor any of its subsidiaries has experienced any material defects in such Material Software, including any material error or omission in the processing of any transactions other than defects which have been corrected, or any disabling codes or instructions and any "back door," "time bomb," "Trojan horse," "worm," "drop dead device," "virus" or other software or hardware (collectively "Threats") that could permit unauthorized access or the unauthorized disruption, impairment, disablement or erasure of such information technology systems (or all parts thereof) or data or other software of users. Company and its subsidiaries use commercially reasonable efforts, having due regard for the heightened risk profile for the industries in which Company and its subsidiaries operate, to protect personally identifiable information, and detecting and correcting Threats, and Company and its subsidiaries have established and at all times maintained appropriate administrative, technical, and physical safeguards designed to ensure the integrity, confidentiality, availability of the Company's or any of its subsidiaries' information technology systems and the data stored on such systems. Company and its subsidiaries have disaster recovery and business continuity plans, procedures and facilities for the business that are commercially reasonable for use in the online retail, data processing, information technology, and software industries. There have been no unauthorized intrusions or breaches of the security

48

of the information technology systems of Company and its subsidiaries, nor have there been any unauthorized uses or disclosures of data (including personally identifiable information) stored on such systems (any such event, a "Security Breach").

(m)    Company and its subsidiaries have maintained in connection with its operations, activity, conduct, and business on the World Wide Web ("Web") and any and all other applicable Internet operations, activity, conduct, and business, at all times during such operations, activity, conduct, and business, a privacy statement or policy governing the collection, maintenance, and use of data and information collected from users of Web sites owned, operated, or maintained by, on behalf of, or for the benefit of Company or its subsidiaries in connection with or related to Company business or the business of any of its subsidiaries ("Company Web Sites"). Since January 1, 2005, during Company's or its subsidiaries' Web or Internet operations, activity, conduct, or business, Company's and its subsidiaries' privacy statements or policies have been made available to users of Company Web Sites in a manner consistent with normal industry practices. Such statement or policy, along with Company's and its subsidiaries' collection, maintenance, and use of user data and information and transfer thereof to the Surviving Corporation under this Agreement by operation of the Merger, complies in all material respects with applicable Legal Requirements, including without limitation laws of the U.S. Federal Trade Commission. The Company's and its subsidiaries' business is, in all material respects, consistent with and compliant with applicable Legal Requirements regarding operations, business, transactions, commerce, or activities operated, conducted, or transacted, and regarding communications transmitted, received, or stored, in whole or in part, via, through, over, in connection with, or related to the Web or the Internet, including, but not limited to, the sale and purchase of goods and services, financial services, taxation and customs and duties, the supply of goods and services on credit, promotional activities and advertising, privacy and data protection, security and encryption, distance contracts, language requirements, storing and publishing and transferring information, and shipping and importing and exporting.

(n)    With respect to the Software listed on Section 3.15(b) of the Company Disclosure Schedule to the extent it is developed or maintained by Company or any of its subsidiaries: (i) Company and its subsidiaries maintain commercially reasonable practices with respect to the development, maintenance, documentation and storage of such Software; and (ii) none of Company and its subsidiaries has disclosed or delivered to any escrow agent or any other Person, or permitted the disclosure to any escrow agent or any other Person of, the source code or the object code (or any aspect or portion thereof) for or relating to any Software.

(o)    Section 3.15(o)(i) of the Company Disclosure Schedule, lists all Material Software that is owned, licensed or used by the Company or its subsidiaries in connection with the conduct of the business and that is subject to a Limited License. A "Limited License" is any type of Contract or distribution model that either does or, depending on how Software is used or distributed, may: (i) prohibit or restrict a Person's ability to charge a royalty or receive consideration in connection with the sublicensing or distribution of any Software; (ii) require the distribution or making available of source code of any Software; (iii) except as specifically permitted by law, grant any right to any Person (other than Company or one of its subsidiaries) or otherwise allow any such Person to decompile, disassemble or otherwise reverse-engineer any Software, (iv) require the licensing of any Software for the purpose of making derivative works, or (v) restrict a Person's ability to place restrictions on Software. By way of clarification but not

49

GSDOCS\1945236.5

limitation, the term "Limited Licenses" shall include: (A) GNU's General Public License (GPL) or Lesser/Library GPL (LGPL), (B) the Artistic License (e.g., PERL), (C) the Mozilla Public License, (D) the Eclipse Public License (EPL), (E) the Netscape Public License, (F) the Sun Community Source License (SCSL), and (G) the Sun Industry Standards License (SISL). The Software listed on Section 3.15(o)(i) of the Company Disclosure Schedule shall be referred to collectively as "Limited License Software." Except for the Limited License Software, none of the Material Software that is owned, licensed or used by the Company or its subsidiaries is, in whole or in part, subject to a Limited License. Except as specifically delineated on Section 3.15(o)(ii) of the Company Disclosure Schedule, none of the Company Products incorporate, embed or are distributed or installed with, any Software that is subject to a Limited License, nor does any Company Product constitute a derivative work of, statically or dynamically link with or otherwise interact with, any such Software. Except as specifically delineated in Section 3.15(o)(iii) of the Company Disclosure Schedule, neither Company, its subsidiaries or their respective employees, nor their consultants have modified the Limited License Software.

(p)     Company or one of its subsidiaries is the registrant of all of its URLs (and is identified as such in the records of the applicable domain name registrars). Company has all right, title and interest in and to, and rights to use on the Internet and otherwise as a trademark and trade name, such URLs.

(q)     Neither this Agreement nor the transactions contemplated by this Agreement, including any assignment to the Surviving Corporation by operation of law as a result of the Merger of any Contracts to which Company or any of its subsidiaries is a party, will result in: (i) Company or the Surviving Corporation or any of its subsidiaries being obligated to grant to any third party any incremental right to or with respect to or non-assertion under any Company Intellectual Property owned by, or licensed to, any of them, (ii) Company or the Surviving Corporation or any of its subsidiaries being bound by, or subject to, any incremental non-compete or other incremental material restriction on the operation or scope of their respective businesses, (iii) Company or the Surviving Corporation or any of its subsidiaries being obligated to pay any incremental royalties or other material amounts, or offer any incremental discounts, to any third party (iv) a material default under any Contracts involving the grant to Company or any of its subsidiaries of any rights in the Company Intellectual Property. As used in this section, an "incremental" right, non-compete, restriction, royalty or discount refers to a right, non-compete, restriction, royalty or discount, as applicable, in excess, whether in terms of contractual term, contractual rate or scope, of those in effect, if at all, immediately prior to the Effective Time, had the parties to this Agreement not entered into this Agreement or consummated the transactions contemplated hereby.

(r)     Company has maintained in all material respects all Intellectual Property Rights with respect to the Company Intellectual Property. Company or its subsidiaries has taken commercially reasonable steps to protect its rights in Trade Secrets of Company or its subsidiaries. Each employee and consultant of Company or its subsidiaries who in the normal course of such employee's duties is involved in the creation of Company Intellectual Property has entered into one or more Contracts with Company, or otherwise has a legal duty, sufficient to vest title in Company of all Intellectual Property Rights created by such employee or consultant in the scope of his or her employment or consultancy, as the case may be, with Company or any of its subsidiaries.

50